**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DURANT TISDALE,** | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 15-5209** |
| | : | |
| **CITY OF PHILADELPHIA et al.** | : | |
| | : | |
| **Defendants.** | : | |

**APPENDIX TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56**

| | | |
|---|---|---|
| Exhibit "A" | Complaint/Incident Report | #1 |
| Exhibit "B" | Biographical Information Report | #2 |
| Exhibit "C" | Philadelphia Police Department Arrest Report | #3-4 |
| Exhibit "D" | Interview: P/O Timothy Gibson | #5 |
| Exhibit "E" | Interview: Brenda Lee | #6 |
| Exhibit "F" | Police Photograph of Plaintiff | #7 |
| Exhibit "G" | Deposition Transcript of Plaintiff | #8-53 |
| Exhibit "H" | Deposition Transcript of P/O Timothy Gibson | #54-98 |
| Exhibit "I" | Deposition Transcript of Det. David Sherwood | #99-135 |
| Exhibit "J" | Deposition Transcript of P/O Robert Whitaker | #15-5209 |

Date:  January 29, 2016

/s/ Aaron Shotland
Aaron Shotland
Assistant City Solicitor
City of Philadelphia Law Dept.
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595

215-683-5434 ▪ (fax)215-683-5397

PHILADELPHIA POLICE DEPARTMENT

## COMPLAINT OR INCIDENT REPORT

| YEAR | DIST./OCC. | D.C. NO. | SECT. | DIST. | VEH. NO. | REPORT DATE |
|------|-----------|----------|-------|-------|----------|-------------|
| '3 | 26 | 33674 | 1 | 22 | 8K11 | 07-05-13 |

| CRIME OR INCIDENT CLASSIFICATION | CODE | TIME OUT A | TIME IN |
|---|---|---|---|
| Burglary | 510 | 1102 © 1125 ® | |

| LOCATION OF OCCURRENCE | | TYPE OF PREM. |
|---|---|---|
| 2220 N Delhi | ☐ IN  ☒ OUT | 070 |

| DATE OF OCCUR. | DAY CODE | TIME OF OCCUR. | X | NATURE OF INJURY |
|---|---|---|---|---|
| 07-05-13 | 5 | 1102 | Ⓟ | None |

| COMPLAINANT | | AGE | RACE | SEX | PHONE (HOME) |
|---|---|---|---|---|---|
| Brian ? Stewart  04-08-60 | | 53 | B | M | 215-494-8100 |

| ADDRESS | PHONE (BUSINESS) |
|---|---|
| 142 W Jackson | |

| FOUNDED | REPORT TO FOLLOW | UNIT | CODE | INV. CONT NO. |
|---|---|---|---|---|
| ☒Yes ☐ No | ☐ Yes ☐ No  ☐ Close Out | | | |

| WITNESS | TRACEABLE PROP. | UNIQUE DESCRIPTION OF OFFENDER | OTHER EVIDENCE |
|---|---|---|---|
| ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |

DESCRIPTION OF INCIDENT (Include Description of Crime Scene if Applicable)

R/C - Arrest

Police recieved r/c for TIP at
the abv location. Flash given was
B/M Blk shirt/white Hat. Police obsv
below witness and below offender at
1000 Arizana. Witness stated to
Police ~~she~~ she obsv offender take white

| WITNESS | ADDRESS | PHONE NO. |
|---|---|---|
| Brenda Lee | 2216 Delhi | Ph# 267-716-1565 |

OFFENDER INFORMATION
Durant Tisdale  07-02-60
3o1 E Erie  oln/30076238

| PROPERTY DESCRIPTION (Include Make, Model, Color and Serial No. Where Applicable) | PROP. CODE | INSURED | STOLEN VALUE |
|---|---|---|---|
| | B | ☐ Yes ☒ No | $1500  $ Recovered |

Grate to basement window from abv
compl property at abv location. Male
placed under arrest transported to EOD.
Police surveyed area for grate w/
negative results.

| VEHICLE 1 — OWNERS NAME | VEHICLE 2 — OWNER'S NAME |
|---|---|
| | |

| VEHICLE 1 — OPERATOR'S NAME | VEHICLE 2 — OPERATOR'S NAME |
|---|---|
| | |

| WANTED/STOLEN MESSAGE SENT  General No.     Date | DIST./UNIT TERMINAL | RECEIPT NO. | SENT BY |
|---|---|---|---|

| REPORT PREPARED BY | # | NO. | DIST/UNIT | TOTAL PAGES | PAGE NO. |
|---|---|---|---|---|---|
| P/o Gibson P/o Whitaker | #0393 | 4742 | 8K11 | 1 | 1 |

| REVIEWED BY | NO. | DIST/UNIT | REFERRAL DATE | GEN NO. |
|---|---|---|---|---|
| | et Paul | 26 | | |

PURSUANT TO ACT 155 OF 1982, THE BELOW PERSON ACKNOWLEDGES RECEIPT OF THE NOTIFICATION OF VICTIM SERVICES FORM:

75-48 Form (Rev. 11/08)     271264/271272

# BIOGRAPHICAL INFORMATION REPORT

☒ ARREST      ☐ INVESTIGATION      ☐ OTHER

(CHECK BLOCKS WHERE DOCUMENTATION EXISTS)

PHILADELPHIA POLICE DEPARTMENT

| DATE | TIME | LOCATION OF INITIAL CONTACT | DISTRICT | D.C. NO. |
|---|---|---|---|---|
| 2-5-13 | 11:40 pm | 1000 Arizona | 22 | 13-26-033674 |

| NAME | LAST | FIRST | MIDDLE | D.O.B. | SEX | RACE |
|---|---|---|---|---|---|---|
| | Dunn | Tistal | | 2-2-60 | M | Blck |

| HEIGHT | WEIGHT | HAIR COLOR | EYE COLOR | COMPLEXION | BUILD | GLASSES (YES/NO) | FACIAL HAIR |
|---|---|---|---|---|---|---|---|
| 5'9 | 185 | Grey | Brn | Med | Med | no | Gotee |

| NICKNAME | ALIASES | MARITAL STATUS |
|---|---|---|
| na | na | Single |

| RESIDENCE STREET NUMBER/NAME | CITY/STATE (OTHER THAN PHILA.) | DIST |
|---|---|---|
| 301 W. erie st | Phila, PA | 59 |

| TYPE OF RESIDENCE | RESIDES WITH | DRIVER NUMBER | STATE |
|---|---|---|---|
| House | Alone | | |

| SOCIAL SECURITY NUMBER | OCCUPATION | EMPLOYER/ADDRESS |
|---|---|---|
| 24132070l | na | na |

| PLACE OF BIRTH/CITY, STATE | GROUP AFFILIATION | ETHNIC BACKGROUND |
|---|---|---|
| Phila, PA | | |

| SCARS, TATTOOS, DEFORMITIES | CLOTHING DESCRIPTION | JEWELRY WORK |
|---|---|---|
| | | |

## VEHICLE INFORMATION

| | YEAR | MAKE | MODEL | COLOR | STATE | TAG | VIN |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |

| | OWNER-LAST NAME, FIRST | ADDRESS | CITY | STATE |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |

| MODUS OPERANDI (METHODS, TRAITS, ETC.) | AREAS FREQUENTED |
|---|---|
| | |

75-229 (Rev 3/92)

AREAS MARKED WITH ▶ MUST BE FILLED IN.
CHECK RELIABILITY BOXES WHEN APPROPRIATE

2

# Philadelphia Police Department Arrest Report

Page 1 of 2 *PARS*

| | | |
|---|---|---|
| Defendant: last name: **TISDALE** | Sex: **Male** | SSN: **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** | DOB: **07/02/1960** |

first name: **DURANT TYRONE**   middle initial:   Race: **Black**   Birth Place: **Philadelphia**

Address: **2341 N 20**   AV Philadelphia PA 19121-

Phone #: **215-000-0000**

| | | | |
|---|---|---|---|
| Year: **2013** | District: **26** | DC#: **13-26-033674** | PSA: **2** | Ctrl#: **00000** |
| PID: **0552509** | SID: 13017905 | OTN: N8703310 | Event: 152078205 | CBN: **1223706** |
| Crime Class: **620** | Desc: **theft except auto theft $50 - $199.99 pocket picking** | | Authority: **Philadelphia Police Department** | |
| DFJ: **N** | | | FBI / FID: **719915T9** | |

Arrest Name: DURANT TISDALE   DOB: 00/00/0000   SSN:

Address given to PPD: 301 W erie AV Philadelphia PA 19133

## ARREST INFORMATION:

Date / Time: 07/05/2013 11:40PM   District: 26   Inside/Outside: O   Arrest Type: **SA**

1000 W Arizona ST  Philadelphia PA 19101-

Slating Date: 07/06/2013   Slating Time: 01:04AM   Sum/Warr:   Issued By AC Magistrate:

## OCCURRENCE:

Date / Time: 07/05/2013 11:02PM   Date reported: 07/05/2013 11:02PM   Inside/Outside: O   Codefendants?: N

2220 N DELHI ST  Philadelphia PA 19101-

*Gun Involved:* **N**   *Gun Discharged:* **N**   *Shooting Victim:* **N**

## FACTS OF THE CASE:

ON 7-6-13 AT APPROX. 11PM THE WITNESS STATED THAT SHE WAS AT HER FRONT DOOR AND OBSERVED THE OFFENDER BENDING DOWN AT HER NEIGHBORS BASEMENT WINDOW. THE WITNESS OBERVED A SHOPPING CART ON THE SIDEWALK. THE WITNESS GRABBED HER PHONE AND CALLED 911 WHAT WAS HAPPENING. THE OFFENDER WALKED AWAY WITH A WINDOW GRATE IN THE SHOPPING CART. THE WITNESS STAYED ON THE PHONE WITH 911 AND PUT THE WINDOW GRATE IN THE STOPPED THE OFFENDER. THE WITNESS STAYED ON THE PHONE WITH 911 AND FOLLOWED THE OFFENDER TO 11TH AND ARIZONA WHERE POLICE STOPPED THE OFFENDER. THE WITNESS TOLD THE POLICE WHAT THE MALE HAD DONE AND TOOK THE MALE INTO CUSTODY. THE WINDOW GRATE WAS NOT RECOVERED.

## CHARGES:

| Code | OC | Description | Grade | Counts |
|---|---|---|---|---|
| CC3921 | | THEFT-UNLWF TAKING | M | 001 |
| CC3925 | | THEFT-RSP | M | 001 |

## REQUESTED HEARING DATE:

07/10/2013 00:00

**REQUESTED HEARING LOCATION:**

603 CJC: 1301 Filbert Street

## COMPLAINANTS AND WITNESSES:

### Complainant(s)

BRIAN STEWART

2220 delhi ST  Philadelphia PA 19101-   Age: 35   Phone(H): 267-716-1565   Phone(W): 215-000-0000   SSN: - -

### Witness(es)

BRENDA LEE

2216 Delhi ST  Philadelphia PA 19101-   Age: 52   Phone(H): 267-716-1565   Phone(W): 215-000-0000   SSN: - -

## ARREST REPORT BY:

220177  SHERWOOD DAVID

Badge  Description

714  59  East Detective Division

Unit Id: 0   Platoon: 3   Squad: B   Group Id:

## ARREST REPORT APPROVED BY:

Supervisor- payroll no:   SMITH JASON   219622   Approval Code: Approved

## POLICE PERSONNEL:

| Employee Name | Payroll Number | Badge | Dist/Unit | Platoon/Group | Vacation Dates | Vacation Description | Needed At Hearing Police/Sup | Arrest OFC. |
|---|---|---|---|---|---|---|---|---|
| SHERWOOD DAVID | 220177 | 714 | 59 / 0 | 3 B | | | | |
| SHERWOOD DAVID | | | | B | 07/09/2013 to 07/09/2013 | Training | Y / N | N |
| GIBSON TIMOTHY TIMOTHY | 271264 | 4742 | 22 / 0 | 5 A | 07/26/2013 to 08/16/2013 | Vacation | Y / N | N |
| | | | | | 09/15/2013 to 09/23/2013 | Vacation | Y / Y | Y |

## ADDITIONAL INFORMATION:

Hits: Y   Statement?:   Lab User Fees Requested?: N   ADA Concerns?:

Rev. 11/1996   EA   07/06/2013 14:37:26

## *Philadelphia Police Department Arrest Report*

| Defendant: last name: **TISDALE** | | Sex: **Male** | SSN: **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** | DOB: **07/02/1960** |
|---|---|---|---|---|
| first name: **DURANT TYRONE** | middle initial: | Race: **Black** | | Birth Place: **Philadelphia** |

### EMPLOYER INFORMATION:

Occupation: unemployed      Employer: unknown      Phone: 215-000-0000

0000 0 unknown 00 APT/Suite: 0000 Philadelphia PA    -

### DESCRIPTIVE DATA:

| | | | |
|---|---|---|---|
| Complexion | CLEAR | Eye Characteristics | NORMAL |
| Eye Color | BRO | Facial Hair | BEARD W_MUSTACHE |
| Glasses (Y=Yes) | 0 | Hair Color | GRY |
| Hair Length | EAR LENGTH | Hair Style | CURLY |
| Teeth | NORMAL | | |

 

# INVESTIGATION INTERVIEW RECORD
## PHILADELPHIA
## POLICE DEPARTMENT
### EAST DETECTIVE DIVISION

| | | | | CASE NO. | | |
|---|---|---|---|---|---|---|
| | | | | INTERVIEWER: Det Sherwood #714 | | |
| NAME: P/O Gibson #4742, PR# 271264 | | AGE: | RACE: White | SEX: Male | DOB: | |
| ADDRESS: 22nd District | | APT. NO: | | PHONE: | | |
| NAME OF EMPLOYMENT/SCHOOL: City of Phila/. | | | | SOC. SEC. NO.: | | |
| ADDRESS OF EMPLOYMENT/SCHOOL: | | DEPARTMENT: | | PHONE NO.: | | |
| DATES OF PLANNED VACATIONS: | | | | | | |
| DATES OF PLANNED BUSINESS TRIPS: | | | | | | |
| NAME OF CLOSE RELATIVE: | | | | | | |
| ADDRESS: | | | | PHONE NO. | | |
| PLACE OF INTERVIEW: EDD | | DATE: 7/6/13 | | | TIME: 12:30a | |
| BROUGHT IN BY: | | DATE: | | | TIME: | |
| WE ARE QUESTIONING YOU CONCERNING: Theft. | | | | | | |
| WARNINGS GIVEN BY: | | DATE: | | | TIME: | |
| ANSWERS: (1) | (2) | (3) | (4) | (5) | (6) | (7) |

Q. What was your tour of duty and assignment?
A. 6p x 2a, 22Bike11.

Q. What happened tonight that brings you here?
A. I was working with my partner P/O Whittaker #2393, PR#271272 in full uniform and operating a marked police vehicle. We received a radio call of a theft in progress from 2200 Delhi. Flash given was a black male wearing a black shirt and white hat last seen in the area of 10th and Dakota. We surveyed the area and observed the defendant and witness at 1000 Arizona Street. Upon investigation, the witness stated to police that she observed the defendant take a white grate from the basement window at 2220 Delhi Street. Police placed the defendant in custody. No grate was recovered from defendant. With help from witness I was able to contact the owner Brian Stewart by cell phone. The defendant was transported to EDD for processing.

Q. Is there anything else you want to add to this interview?
A. No

#4742 07-06-13

5

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT EAST DETECTIVES | CASE# |
|---|---|---|

**NAME**
Brenda Lee

**AGE** 52
**RACE/SEX** B/F

**INTERVIEWER:** DET SHERWOOD #714

**ADDRESS**
2216 Delhi Street

**APT#**

**DOB** 4/26/61
**PHONE#** 267 716 1565

**NAME OF EMPLOYER / SCHOOL**

**SS#**

**ADDRESS OF EMPLOYER / SCHOOL**

**PHONE#**

**DATES OF PLANNED VACATION / BUSINESS TRIPS**

**NAME OF CLOSE RELATIVE**

**RELATIONSHIP**

**ADDRESS OF RELATIVE**

**PHONE#**

**PLACE OF INTERVIEW**
EDD

**DATE** 7/6/13
**TIME** 1220a

**BROUGHT IN BY**
Self

**DATE** 7/6/13
**TIME** 1200a

**WE ARE QUESTIONING YOU CONCERNING:**
theft.

**WARNINGS GIVEN BY:**

**DATE**   **TIME**

**ANSWERS:**

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q. What happened tonight that brings you here?
A. I was in my front of my house at 2216 Delhi Street and I seen a male bending down at my neighbors house and I noticed a shopping cart on the sidewalk. I grabbed my phone and went outside as the male was walking away with the shopping cart. I noticed that my neighbors cellar window grate was missing. I called 911 and gave a description of the male. I then followed the male in my car and stayed on the phone with 911. The police stopped the male at 11th and Arizona Street and I told the police that that is the male that stole the window grate. The male did not have the grate on him when the police stopped him.

Q. What is your neighbors address?
A. 2220 Delhi Street. It's my cousins house.

Q. Can you describe the male?
A. B/M wearing a white hat turned backwards, black pants and a black shirt.

Q. Had you seen him before?
A. No.

Q. What is your neighbors name?
A. Brian Stewart. He is my cousin.

Q. Was your neighbor home?
A. No.

Q. Have you spoke to Brian tonight?
A. Yes.

Q. Did he give the male permission to take the grate?
A. No.

Q. Is there anything else you want to add to this interview?
A. No.

7-6-13
*Brenda Lee* (signature)

| RECORD   YES   NO | CHECKED BY: |
|---|---|
| REVIEWED BY: | |

75-483

6



# Philadelphia Police Department

**EVENT#:** 152078205

**PID#:** 552509

**NAME:** DURANT TYRONE TISDALE

**ARREST DATE:** Jul 6 2013 8:21AM

**AGE AT ARREST:** 53

**HEIGHT:** 509

**WEIGHT:** 185

**HAIR COLOR:** GRAY OR PART

**EYE COLOR:** BROWN

**Phil Arrestee DATABASE**



**FOR INVESTIGATION ONLY
NOT FOR IDENTIFICATION
DESTROY AFTER 90 DAYS**

Printed Philadelphia PD:

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CIVIL TRIAL DIVISION

— — —

DURANT T. TISDALE,      :   CIVIL ACTION
       Plaintiff,     :
                       :
     vs.           :
                     :   NO. 15-5209
THE CITY OF PHILADELPHIA:
LAW DEPARTMENT, et al., :
      Defendants.   :    ORIGINAL

— — —

      Oral Deposition of DURANT T. TISDALE,
held in the offices of CITY OF PHILADELPHIA LAW
DEPARTMENT, One Parkway Building, 1515 Arch Street,
14th Floor, Philadelphia, Pennsylvania, on
Friday, January 8, 2016, beginning at 1:49 p.m.,
before DONNA M. RAY, Registered Professional
Reporter and Certified Court Reporter.

— — —

SUMMIT COURT REPORTING, INC.
Certified Court Reporters & Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

**DURANT T. TISDALE**

```
 1    APPEARANCES:

 2

 3    BY:  MICHAEL I. McDERMOTT, ESQUIRE
      1026 Winter Street, Suite 200
 4    Philadelphia, Pennsylvania  19107
      (215) 925-9732
 5    Counsel for Plaintiff

 6

 7    CITY OF PHILADELPHIA
      LAW DEPARTMENT
 8    BY:  AARON SHOTLAND, ESQUIRE
      One Parkway Building
 9    1515 Arch Street
      14th Floor
10    Philadelphia, Pennsylvania  19102
      (215) 683-5434
11    Counsel for Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24
```

DURANT T. TISDALE

1                        I N D E X

2

  WITNESS

3

  DURANT T. TISDALE

4

      EXAMINATION                              PAGE

5

      By:  Mr. Shotland                          4
6     By:  Mr. McDermott                        36

7

8

9

10                      - - -

11             E X H I B I T S

12  EXHIBIT NO.    DESCRIPTION    PAGE FIRST REFERENCED

13          (No Exhibits Were Marked.)

14                      - - -

15

16

17

18

19

20

21

22

23

24

**DURANT T. TISDALE**

1              (It is stipulated by and among

2     counsel for the respective parties that signing,

3     sealing, certification and filing are waived and

4     that all objections, except as to the form of the

5     question, are reserved until the time of trial.)

6                         - - -

7              DURANT T. TISDALE, having been first

8          duly sworn, was examined and testified as

9          follows:

10                        - - -

11                  EXAMINATION

12                        - - -

13    BY MR. SHOTLAND:

14       Q.    Good afternoon, Mr. Tisdale.  My name is

15    Aaron Shotland, and I represent the defendant --

16    all the defendants in this case, the police

17    officers and the City of Philadelphia.

18              What you're here for today is called

19    a deposition.  Have you ever been deposed before?

20       A.    I don't understand.

21       Q.    So what we're here for is a deposition,

22    which is, essentially, an interview.  I'm going to

23    be asking you questions.  You'll answer the

24    questions.  The court reporter here is writing down

**DURANT T. TISDALE**

1    everything that we both say.

2              Have you ever gone through this

3    process before?

4        A.    No.

5        Q.    Okay.  I'm going to give you some

6    instructions so things go a little bit more

7    smoothly than otherwise.

8              Because she's writing down

9    everything, we want to not talk over each other.

10   So try to wait until I'm finished asking the

11   question before you begin to answer.

12             Do you understand?

13       A.    Yes, I understand.

14       Q.    A lot of times in conversation if you know

15   the answer to a question even before someone is

16   finished asking it you'll answer it, but that

17   doesn't work in this setting because she's writing

18   everything down.

19             Okay?

20       A.    Yes.

21       Q.    Also, you need to keep your answers

22   verbal.  So you're doing fine so far, but make sure

23   that you give a verbal answer as opposed to a nod

24   or shake of the head and try not to demonstrate

**DURANT T. TISDALE**

1    anything with your body.  Try to use your words as

2    much as possible so that the record is clear as to

3    kind of what you're trying to express.

4        A.    Okay.

5        Q.    If you don't understand a question, let me

6    know and I'll rephrase it.  If you answer the

7    question, I'm going to assume that you understood

8    it.

9             Do you understand?

10       A.    Yes.

11       Q.    Have you taken any medications today that

12   would prevent you from testifying honestly or

13   accurately?

14       A.    No.

15       Q.    Are you on any medications at all?

16       A.    Yes.

17       Q.    What are you on currently?

18       A.    Blood thinners and high blood pressure

19   medication.

20       Q.    Would either of those medications affect

21   your ability to testify honestly or accurately?

22       A.    No.

23       Q.    Okay.  How are you feeling today?

24       A.    Fine.

DURANT T. TISDALE

1      Q.    All right.   Good to hear.

2            Can you state and spell your name

3   for the record?

4      A.    Yes.   My name is Durant Tisdale.   Durant

5   is spelled D-U-R-A-N-T.   Tisdale is spelled

6   T-I-S-D-A-L-E.

7      Q.    Do you have a middle name?

8      A.    Yes.

9      Q.    What is your middle name?

10     A.    Tyrone.

11     Q.    What is your date of birth?

12     A.    7/2/60.

13     Q.    What is your Social Security number?

14     A.    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.

15     Q.    Where do you currently live?

16     A.    I'm currently residing at 1242 West

17   Allegheny Avenue in Philadelphia, PA, 19133.

18     Q.    How long have you lived on West Allegheny?

19     A.    I've been there roughly about three weeks

20   now.

21     Q.    Just moved?

22     A.    Yes.

23     Q.    Where did you live prior to West

24   Allegheny?

**DURANT T. TISDALE**

1      A.    I was at 3950 North D Street.

2      Q.    How long were you there?

3      A.    About nine months.

4      Q.    We're here for an incident which occurred

5  back in 2013, July 6th.

6            Where did you live on that day?

7      A.    2341 North 20th Street.

8      Q.    When did you move there?

9      A.    I moved there -- if I'm not mistaken, it

10 was December of 2012.

11     Q.    When did you move out of there?

12     A.    Well, I got arrested in July.  So when I

13 got arrested being that I'm -- was on state parole,

14 they put a detainer on me, and I was incarcerated

15 until I got to trial.  That's why I lost that

16 place.

17     Q.    So on July 6th you were arrested and you

18 lost the residence on 20th Street?

19     A.    Yes.  It was actually July 5th when I got

20 arrested.

21     Q.    Okay.  And then you were held over the

22 night until the 6th?

23     A.    Yes.

24     Q.    Okay.  Who did you live at the 20th Street

DURANT T. TISDALE

1   address with?

2       A.   I stayed alone.

3       Q.   And do you have -- are you married?

4       A.   No.

5       Q.   Do you have any kids?

6       A.   Yes.

7       Q.   How many?

8       A.   Five.

9       Q.   Are you currently employed?

10      A.   I'm with an agency.  I work occasionally

11  here and there.

12      Q.   Like a temp agency?

13      A.   Yes.

14      Q.   How often would you say you work

15  currently?

16      A.   It varies.  I might work three days one

17  week, one day the next week.  I might not see no

18  more work for another week or two.  It varies.

19  Whenever something is available.

20      Q.   Do you have any other source of income

21  other than your employment?

22      A.   My son helps me out.

23      Q.   Okay.  On the night of July 5th, 2013,

24  what did you do that night?

DURANT T. TISDALE

1    A.    What did I do that night?

2    Q.    Yes.  Like, before you had any interaction

3  with the police before you were arrested, what did

4  you do kind of during that day or that night?

5    A.    After I got -- I worked that day.  When I

6  got off work, I stopped by my cousin's house.  He's

7  like in his 70s.  He's in his 70s now.  He was in

8  his 70s then, but I generally stop by to check on

9  him.  I stopped by there.

10         When I left there, I was walking.  I

11  walked up to 11th Street.  I was going to catch the

12  23 bus to Lehigh Avenue and then catch the 54 on

13  Lehigh.  I walked up 11th Street.  I got up to

14  around 11th and Dauphin -- between Dauphin and

15  York.  I was going to the bus stop.

16         A woman pulled up.  The police

17  officer pulled up second behind her.  She got out

18  of the car and she pointed in my direction and

19  said, "That's him."  I looked around, you know, to

20  see what she was pointing at because I'm the only

21  one standing there.  She said, "That's him.  He's

22  the one that stole my gate."  The officers come

23  over and was telling me that the woman accused me

24  of taking some property of hers and they asked me

DURANT T. TISDALE

1    did I have the gate.  I said, "I don't have no

2    gate."  They looked around and didn't find no gate.

3              Another officer went back to the

4    car.  The other officer came back and asked me you

5    people use House of Iron scrap metal and stuff to

6    make odds and ends.  I said, "I just got off work.

7    I don't have no gate.  I didn't take anything."

8              They kept -- I took it as harassment

9    or an assault because he -- they kept saying that I

10   have the gate.  Where is the gate at?  What did you

11   do with the gate?  What did you do with the gate?

12   I said that I don't have no gate.

13             I started getting upset.  I said

14   that I threw the damn gate on the roof like that

15   because I never had no gate.  No gate.  No tools.

16   I don't have an automobile.  There was no way for

17   me to -- in the area that I was located at there's

18   nothing -- there's nowhere to hide anything.  At

19   that point they arrested me.

20       Q.   Okay.  Let's back up to your -- you worked

21   that day, right?

22       A.   Yes.

23       Q.   Where did you work?

24       A.   At Citizens Bank Ballpark.

**DURANT T. TISDALE**

1    Q.   What did you do at Citizens Bank Ballpark?

2  What was your job?

3    A.   Housekeeping.  I generally do pressure

4  washing, but during -- throughout the day if

5  there's anything else that's needed to be done and

6  I'm there, they would ask us to help out with

7  whatever else needed to be done.

8    Q.   Just odd jobs around the stadium?

9    A.   Yes.  Cleaning.  They call it

10  housekeeping.

11    Q.   Okay.  Was there a game that night?

12    A.   Yes.  It was the early game.  Early game

13  that day.

14    Q.   So what time would you have gotten off of

15  work?

16    A.   Around about 9:00, 9:30.  Something like

17  that.

18    Q.   And then you went and you visited your

19  cousin?

20    A.   Yes.

21    Q.   What is your cousin's name?

22    A.   George Kenneth.

23    Q.   Where does George Kenneth live -- or where

24  did he live at the time?

DURANT T. TISDALE

1     A.   He still resides there.  2005 North
2  Marshall Street.
3     Q.   What part of the city is that?
4     A.   North Philadelphia.
5     Q.   Do you take the Broad Street line up
6  there?
7     A.   Yes.  I took the Broad Street line to
8  Cecil B. Moore Avenue.  Then I caught the three bus
9  going east.  I got off at 6th and Berks and walked
10 up 6th Street and went over to Morris.  Marshall is
11 between 7th and 6th.  The twenty hundred is between
12 Morris and Diamond.
13    Q.   You went and you visited with your cousin
14 when you got there, right?
15    A.   Yes.
16    Q.   How long did you stay there?
17    A.   About 20, 30 minutes maybe.
18    Q.   Does that put us -- I'm kind of trying to
19 piece together the timeline here.
20         You got off work around 9:00.  It
21 probably took about 45 minutes to get to your
22 cousin's house; is that fair?
23    A.   Yes.
24    Q.   That would put you close to 10:00.  You

**DURANT T. TISDALE**

1  spent 20 or 30 minutes there and left some time

2  after 10:00?

3      A.   Yes.

4      Q.   And from there you were going to walk to

5  11th Street?

6      A.   Yes.

7      Q.   To catch a bus, right?

8      A.   Yes.

9      Q.   And before you got to that bus, you were

10  stopped by a police car?

11      A.   Yes.

12      Q.   You observed a woman in the police car?

13      A.   No.

14      Q.   No?

15      A.   She pulled up.  She was parked across the

16  street.

17      Q.   She was driving?

18      A.   Yes.  Before the police even arrived, she

19  pulled up in an automobile and parked across the

20  street.  About 30 seconds later the police pulled

21  up in their automobile and she jumped out and said

22  "That's him."

23      Q.   Did she say anything to you before the

24  police arrived?

DURANT T. TISDALE

1      A.    No.

2      Q.    But you just noticed her?

3      A.    Yes.

4      Q.    Were you waiting for the bus there or were

5   you walking?

6      A.    I was waiting for the bus.

7      Q.    Okay.  So you're at a bus stop?

8      A.    Yes.

9      Q.    So she didn't say anything to you?  She

10   pulled up and then you saw a police car pull up --

11      A.    Yes.

12      Q.    -- afterwards and you saw officers speak

13   with the woman?

14      A.    When the officers pulled up, she jumped

15   out of the car and she was like sort of flagging

16   them and said "That's him."  That's when I looked

17   around like who is she talking about.

18      Q.    She pointed at you?

19      A.    Yes.  She was pointing in my direction,

20   but I'm thinking somebody else is around because I

21   know I didn't do anything.

22      Q.    And after she identified you, the police

23   officers talked to you, right?

24      A.    Yes.

DURANT T. TISDALE

1    Q.    I think you described the police officers

2  asked you where the grate was?

3    A.    Yes.

4    Q.    You said you didn't know?

5    A.    I didn't even know what they were talking

6  about.

7    Q.    Right.  At some point you said, "I threw

8  the grate on the roof"?

9    A.    Yeah, because they were like -- after

10 asking me several times and looking around the

11 vicinity and didn't find nothing, it's as if --

12 they was asking me as if I was lying to them.  Like

13 I told the officer, I said, "Listen, I don't want

14 no trouble.  I just got off work.  I'm on parole.

15 I'm not trying to go back to jail.  I didn't have

16 any grate.  I don't know what you're talking

17 about."

18    Q.    Okay.  But then after being questioned at

19 some point you said "I threw the grate on the

20 roof"?

21    A.    It went from like a question, from being

22 questioned, to like telling me where is the grate

23 at.  We know you got the grate.  What did you do

24 with it?  It went from asking questions to like,

### DURANT T. TISDALE

1    you know, insisting that I had it.  It got me
2    upset.
3        Q.    And I guess you were upset, and that's
4    when you said you threw the grate on the roof?
5        A.    After they looked around underneath the
6    cars, alleyways, anyplace they could look to search
7    and see and found nothing, they continued to ask me
8    what did I do with the grate.  The woman was
9    telling the officers, "He just had it.  When you
10   all pulled up, he just had it.  What he done with
11   it, I don't know."  I don't even know what she's
12   talking about.
13       Q.    You didn't have a grate when the female
14   pulled up?
15       A.    I don't know if it was a grate or gate or
16   fence or what.  I don't know what it was.
17       Q.    Okay.  Do you know a person named Brenda
18   Lee?
19       A.    No.
20       Q.    Okay.  Did you know the woman that was
21   accusing you of stealing the grate?
22       A.    No.
23       Q.    You didn't recognize her from anywhere?
24       A.    No.

DURANT T. TISDALE

1    Q.    Okay.   Back to your employment at Citizens

2 Bank Park, what was your uniform that you wore when

3 you were working?

4    A.    Phillies ball cap, grayish-colored T-shirt

5 -- polo shirt with a Phillies emblem right here

6 (indicating).

7    Q.    There is an arrest photo sitting in front

8 of you.

9          Do you recognize that photograph?

10    A.    That's me on there.

11    Q.    Is that you on the morning after you were

12 arrested?

13    A.    This is the following day.

14    Q.    Right.

15    A.    The next day.

16    Q.    Right.   The following morning.   The time

17 on it is --

18    A.    8:21 a.m.

19    Q.    Right.   So that was the morning after you

20 were arrested, right?

21    A.    Um-hmm.

22    Q.    You've got to say yes or no.

23    A.    Yes.

24    Q.    Just for the record, you have to say yes

**DURANT T. TISDALE**

1   or no.  I understood you, but it won't be clear on

2   the record.

3               That shirt that you are wearing, was

4   that part of your uniform?

5       A.   No.

6       Q.   Okay.  Is that a different shirt than you

7   were wearing when you were arrested?

8       A.   Yes.

9       Q.   What kind of shirt were you wearing when

10  you got arrested?

11      A.   My uniform shirt.

12      Q.   What is that shirt?

13      A.   That's a black T-shirt.

14      Q.   Where did you get that black T-shirt?

15      A.   I had a bookbag with me with a T-shirt and

16  another pair of pants in there.

17      Q.   So you changed your outfit?

18      A.   I changed my shirt because I was sleeping

19  on the floor in the holding tank at the police

20  department.

21      Q.   Did they let you bring your bag in to

22  change?

23      A.   Yeah.  They didn't take anything from me.

24      Q.   Okay.  Were you wearing a hat when you

**DURANT T. TISDALE**

1   were arrested?

2       A.    Yes.

3       Q.    What color was the hat?

4       A.    It was a blue -- it's a baseball cap.

5   It's blue with red in the front with the Phillies

6   emblem on it.

7       Q.    Okay.  Moving to after your arrest, you

8   said you spent the night in the holding tank?

9       A.    Yes.

10      Q.    Then you were processed it looks like --

11      A.    Yes.

12      Q.    -- based on the time of your arrest photo;

13  is that fair?

14      A.    Yes.

15      Q.    What happened next?

16      A.    While I was there?

17      Q.    After you were processed, what happened?

18      A.    After I was processed, I seen a gentleman

19  on closed-circuit TV.  They gave me bail and 30

20  minutes later they were sending me to jail.

21      Q.    What jail did they take you to?

22      A.    First they took me to the House of

23  Corrections.  About two weeks later -- about two

24  weeks later they took me to Graterford.

DURANT T. TISDALE

1      Q.   How much time did you serve in jail after
2  this arrest?
3      A.   I was there until like December the 5th or
4  December the 6th.
5      Q.   So about five months?
6      A.   About five or six months.
7      Q.   That was split between the House of
8  Corrections and Graterford?
9      A.   Well, at the House of Corrections I was
10 there only about two weeks.  The rest of the time I
11 was at Graterford.
12     Q.   Any issues while you were in prison?
13     A.   Stressed out.  Depressed.
14     Q.   Anything else?
15     A.   I can think of many things.  It bothered
16 me.  Couldn't sleep.  Nervous.  Scared I was going
17 back to jail.  A million things.  I can't think of
18 all of them right now.
19     Q.   Do you have any idea why this woman Brenda
20 Lee -- I'll represent to you that the witness in
21 the case, at least according to the police
22 paperwork, was named Brenda Lee.
23          Do you have any idea why she accused
24 you of stealing the grate?

DURANT T. TISDALE

1      A.    I don't know.  I don't have an idea.

2      Q.    Okay.  Now, you mentioned that you were on

3  parole or probation?

4      A.    Parole.

5      Q.    Parole.  I didn't ask you yet about your

6  criminal history.

7            What were you on parole for?

8      A.    Robbery.

9      Q.    How much time did you serve for the

10  robbery conviction?

11      A.    About eight years.

12      Q.    And you had been paroled in what year?

13      A.    2009.

14      Q.    So you had been out of jail for about four

15  years?

16      A.    Yes.

17      Q.    And how long did your parole or probation

18  last?

19      A.    I'm still on parole.

20      Q.    How long does it last?

21      A.    Until September 2017.

22      Q.    So about eight years from your release

23  date?

24      A.    Um-hmm.  Yes.

**DURANT T. TISDALE**

1     Q.   Other than the robbery conviction, do you

2 have any other convictions, criminal convictions?

3     A.   Before that.

4     Q.   To the best of your recollection.  I know

5 you don't have your criminal -- any kind of

6 paperwork in front of you to tell you the dates,

7 but as far as you can recall?

8     A.   I have two drug cases.

9     Q.   Were you convicted?

10     A.   Yes.  It was like probation, but it's

11 still a conviction.

12     Q.   You received probation?

13     A.   Um-hmm.  Yes.

14     Q.   When was that?

15     A.   A can't remember exactly.

16     Q.   Was it prior to the --

17     A.   It was before the robbery.  Years before

18 the robbery.

19     Q.   Anything else in your criminal history?

20     A.   Not that I can remember.  There's a few

21 things.  I can't exactly remember what they were

22 all about.

23     Q.   Any other felonies besides the robbery?

24     A.   No.

**DURANT T. TISDALE**

1    Q.   So if I understand kind of the status of

2  your criminal kind of situation at the time of this

3  arrest, you were on parole from the robbery

4  conviction and that parole was set to last and

5  still is set to last until 2017?

6    A.   Correct.

7    Q.   And did that affect your ability to make

8  bail or --

9    A.   Yes.

10    Q.   So how does that work?

11    A.   When you're on state parole and you've

12  been charged -- have police contact and as they say

13  "catch a case," you have a bail set.  They won't

14  let you pay the bail.  The state will come pick you

15  up and take you upstate and detain you until the

16  outcome of your open case.

17    Q.   Do you know whether bail was set in this

18  case?

19    A.   Yes.

20    Q.   What was bail set at?

21    A.   $2,000.

22    Q.   Did you ever pay the bail?

23    A.   I would have to pay 10 percent of that,

24  but they wouldn't let me pay because I'm on state

**DURANT T. TISDALE**

1    parole.  If I pay the bail, they're still not going

2    to let me go.

3        Q.    My question is just whether you ever tried

4    to pay it.

5            Did you ever pay the $200?

6        A.    They wouldn't let me pay it.  It's

7    something that the state does with the county and

8    they call it a payoff and they take you upstate.

9        Q.    Well, I think I understand that you

10   wouldn't have been released from custody if you had

11   paid the bail, but I'm wondering whether you ever

12   attempted to pay it and they said you can't pay

13   this?

14       A.    That's what happened.

15       Q.    That's what happened?

16       A.    Right.

17       Q.    Okay.  When was that?  When did you try to

18   pay the bail?

19       A.    My significant other was going to pay it,

20   and they told -- I don't remember what date.  It

21   was in July, though, but they told her they're not

22   going to accept the money -- this is what they told

23   her.  We're not going to accept the money because

24   he's not going to be released.  That's what they

DURANT T. TISDALE

1    told her.

2       Q.    I understand that you were in jail until

3    December, right?

4       A.    Yes.

5       Q.    Of 2013?

6       A.    Yes.

7       Q.    Now, what caused you to be released from

8    jail?

9       A.    All I know is that the charges was

10   dismissed or I was -- I don't know.  They never

11   even took me down.  All I know was they told me the

12   charge was dismissed or the District Attorney

13   withdrew it or something.  I don't exactly know.

14      Q.    As far as visits to court while you were

15   incarcerated for this arrest, did you -- other than

16   the arraignment that you testified about where you

17   went to CCTV -- that was an arraignment, right?

18      A.    That was a bail hearing really, actually.

19      Q.    Okay.  That was your bail hearing.  Then

20   you were taken to HOC.

21            Did you ever go back to court?

22      A.    No.

23      Q.    So you just remained at either HOC or

24   Graterford for the remainder of the time?

**DURANT T. TISDALE**

1    A.    Yes.

2    Q.    Were you at Graterford because you had

3  previously been a state prisoner or you were on

4  state parole?  Is that why you were at Graterford?

5    A.    Well, it's like until my bail was paid,

6  right, I stayed in the county but the state and the

7  county have this thing that is called a payoff.

8  That's all I know, is it's called a payoff, and I

9  think the state paid my bail.  That's why I went

10  upstate.  I don't know how they do that or how they

11  work that out.

12    Q.    So you don't really know why you ended up

13  at Graterford?

14    A.    I know why because I'm state property.

15    Q.    Right.  Because you were on a detainer

16  from a state court conviction, the state sentence?

17    A.    Right.

18    Q.    You said that the outfit that you were

19  wearing when you were arrested was a gray Phillies

20  polo shirt?

21    A.    Yes.  I had on blue jeans.  I'm trying to

22  think.  Was it blue jeans or black Dickies?  I

23  think it was blue jeans and a gray polo shirt with

24  the Phillies emblem and a ball cap.  I also had my

**DURANT T. TISDALE**

1      --

2      Q.    Badge?

3      A.    Yes.  I had it around my neck.  The ID tag

4   that you swipe (indicating).

5      Q.    You were motioning for something around

6   your neck like a lanyard I think they're called?

7      A.    It's a tag with your -- like your

8   identification, but it's on a --

9      Q.    A string thing?

10      A.    Yes.

11      Q.    I understand what you're saying.  I'm just

12   trying to make it clear for the record.

13              If you recall the tone of your gray

14   shirt, was it like a charcoal gray or a lighter

15   gray?

16      A.    It wasn't no light gray.

17      Q.    It was like a dark gray?

18      A.    Yes.  It was like a darker gray.

19      Q.    Prior to seeing the female witness that

20   accused you of stealing the grate kind of pull up

21   alongside of you, did you see her before that day

22   at any point?

23      A.    That's the first time I ever seen her.

24      Q.    Do you know where 2220 North Delhi Street

DURANT T. TISDALE

1  is?

2       A.    I know where Delhi Street is.

3       Q.    Okay.  I guess it would be the 2200 block

4  of Delhi Street closer to 23rd?

5       A.    I'm from that neighborhood because I grew

6  up on 8th and Diamond, 2100 block of Diamond

7  Street.

8       Q.    Do you know whether you passed by or spent

9  any time in front of 2220 North Delhi Street on

10  your walk from your cousin's house to 11th Street?

11       A.    I remember exactly which way I went.  I

12  came up Marshall Street.  I came up Marshall Street

13  to Diamond.  I went west on Diamond to 9th Street.

14  I went north up 9th Street to Susquehanna and I

15  went west on Susquehanna to 11th.  Then I went

16  north up 11th.

17       Q.    Okay.

18       A.    I never walked by Delhi Street.  It's in

19  that vicinity, but the route that I took wouldn't

20  even took me past that block.

21       Q.    How close to that block did you get, if

22  you recall?

23       A.    As a matter of fact, I did walk by there.

24  I walked -- Delhi Street runs north and south.

DURANT T. TISDALE

1    Susquehanna runs east and west.  This is 9th

2    street.  This is Susquehanna (indicating).  I

3    walked straight down Susquehanna.  I never went on

4    Delhi Street.

5        Q.    Okay.  But you would have walked kind of

6    by that block while you were on Susquehanna?

7        A.    Yeah.  I've got to cross that block to get

8    from -- there is a street -- it's between 9th

9    Street and 10th Street.  So I would have to cross

10   that block.

11       Q.    Okay.

12       A.    But I never ventured on that block.

13       Q.    Now, as far as your employment with the

14   Phillies, how often did you work for the Phillies

15   around the time of your arrest in July of 2013?

16       A.    I was working steady full time.

17       Q.    Full-time employee?

18       A.    Yeah.

19       Q.    How many hours a week?

20       A.    Forty.  Sometimes more.

21       Q.    And how much did you earn a week?

22       A.    About 9.50 -- a week?

23       Q.    Or however you want to do it.

24       A.    About 9.50.

**DURANT T. TISDALE**

1    Q.    $9.50 an hour?

2    A.    Yes.  About 9.50 or 9.55.  Something like

3    that.  I'm not sure.

4    Q.    Do you recall what your take-home pay was

5    for a two-week check or a month check?

6    A.    It would vary because, like, working with

7    the Phillies I would have my regular 40 hour week,

8    but during game days the hours would stretch out.

9    Sometimes I would have a lot of overtime.

10   Q.    So it varied?

11   A.    Yeah.

12   Q.    Did you ever work less than 40 hours a

13   week?

14   A.    No, not that I can recall.

15   Q.    Did you file taxes in 2013 or for the tax

16   year 2013?

17   A.    Yes.

18   Q.    What about for 2014?

19   A.    No.  I lost my job when I got arrested

20   because I had no call, no show.  I sat in jail for

21   about six months.

22   Q.    After you were released in December of

23   2013, were you able to find another job?

24   A.    No.

1    Q.    Okay.  What was the first job you started

2  working at after your release from jail?

3    A.    I was doing odds and ends.  Odd jobs.

4  First -- the first job as far as getting a paycheck

5  was -- I started July of this year.

6    Q.    What job was that?  It probably would have

7  been July of last year?

8    A.    Yes.  July of 2015 when I started working

9  with -- down at Trinity Staffing.

10    Q.    Is that the position you're currently in?

11    A.    Yes.

12          MR. SHOTLAND:  Could we go off the

13          record for a second?

14          (There was a discussion held off the

15          record.)

16  BY MR. SHOTLAND:

17    Q.    Mr. Tisdale, I think we have now talked

18  about your arrest, your roughly five months

19  incarceration and the issues related to your

20  incarceration, as well as the period of time you

21  missed from work as a result of the arrest,

22  correct?

23    A.    Yes.

24    Q.    Is there anything else that -- any other

**DURANT T. TISDALE**

1   kind of damages that you attribute to your arrest

2   from July of 2013 other than what we have already

3   talked about?

4       A.    Well, when I was released, I was released

5   on parole with no job and nowhere to go.  I had to

6   go stay at my aunt's and sleep on her couch.

7                My stress level went up so bad I had

8   a heart attack like a couple of weeks after getting

9   out of jail because I was like really going through

10  things mentally in my head, you know.  The first

11  time in my life I'm doing something right and then,

12  you know, this happened to me.  It takes me all the

13  way back to now I lost everything.  I'm on

14  somebody's couch.  I'm on parole.  At any given

15  time they can come pick me up and take me to jail

16  because I'm not stable as far as financially or

17  stable housing and things of this nature.

18                I really think that played a part in

19  it because had I not got arrested for something I

20  didn't even do, none of that wouldn't have

21  happened.

22      Q.    How long were you hospitalized -- or were

23  you hospitalized for the heart attack?

24      A.    Yes.  About two or three weeks.  Something

**DURANT T. TISDALE**

1    like that, maybe.

2        Q.    Where did you go?

3        A.    Temple.

4        Q.    Temple Hospital?

5        A.    Yes.

6        Q.    How is your health now?

7        A.    Well, it's fair, but I still have to take

8    thinners and some other kind of pills.  They say

9    I'll be taking that for the rest of my life.

10       Q.    Is that a pill for high blood pressure?

11       A.    No.  It's for my heart.  They had to put

12   stents in my heart.

13       Q.    You had heart surgery?

14       A.    Not open heart surgery, but they put

15   something in there.

16       Q.    You take medication for whatever they put

17   in there?

18       A.    For my heart, um-hmm.

19       Q.    Yes?

20       A.    Yes.

21       Q.    Anything else as a result of the arrest?

22       A.    No.  I'm still struggling.  I know that.

23       Q.    Now, the defendants in this case are

24   Timothy Gibson and David Sherwood.

DURANT T. TISDALE

1          Do you recognize -- they're both
2    police officers -- or one was a police officer and
3    one was a detective.
4          Do you know who those people are?
5     A.    Excuse me.  Could you rephrase that?  One
6    was what?
7     Q.    One was a detective.  David Sherwood is
8    actually a detective.  He's sued as a police
9    officer, but we have learned that he's actually a
10   detective with the police department.
11    A.    When I was arrested, I was arrested by two
12   uniformed police officers.
13    Q.    Okay.  Do you know their names?
14    A.    No.
15    Q.    Does the name Timothy Gibson ring a bell,
16   Police Officer Gibson?
17    A.    The only names I know is what is on the
18   report, but I know I was arrested by two uniformed
19   police officers because the day of the arrest I
20   requested a white shirt or to speak to a detective.
21   They refused to let me do that.
22    Q.    What about a Police Officer Whitaker?  Was
23   that a familiar name?
24    A.    No.

DURANT T. TISDALE

1      Q.    Okay.

2      A.    I know there was two.  They were young

3   Caucasians and they were uniformed police officers.

4      Q.    Two male -- white male officers?

5      A.    Yes.

6      Q.    They were younger?

7      A.    Yes.

8      Q.    About how old?

9      A.    It looked like they was in their twenties

10   to me.

11            MR. SHOTLAND:  Those are all the

12         questions I have for you.  Thank you.

13            MR. McDERMOTT:  I just have a few

14         questions.

15   BY MR. McDERMOTT:

16      Q.    Mr. Tisdale, the night that you were

17   arrested you were standing at a bus stop, correct?

18      A.    Yes.

19      Q.    What bus were you waiting for?

20      A.    The 23.

21      Q.    Prior to that time, you were at your

22   cousin's house?

23      A.    Yes.

24      Q.    Did you actually see your cousin?

DURANT T. TISDALE

1     A.    Yes.

2     Q.    What is his name?

3     A.    George Kenneth.

4     Q.    You left Mr. Kenneth's home and you

5  actually crossed Delhi Street, correct, as you were

6  walking to the bus?

7     A.    Yes.

8     Q.    Did you take any grate at any time from

9  any property on Delhi Street?

10     A.    No.

11     Q.    Did you have in your possession at any

12  time a shopping cart?

13     A.    No.

14     Q.    Did you have in your possession at any

15  time a grate?

16     A.    No.

17     Q.    When the lady -- the woman stopped her

18  car, what attracted your attention to her car?

19     A.    She pulled up and -- I'm from North

20  Philly.  If an automobile pulls up, to be safe, I

21  looked.

22     Q.    So just her pulling up attracted your

23  attention?

24     A.    Yes.

**DURANT T. TISDALE**

1    Q.    How long after that did the police come?

2    A.    About 25 to 30 seconds later.

3    Q.    Did they pull right behind her?

4    A.    They pulled like right beside her.

5    Q.    Okay.  When they approached you, what did

6    you tell them?

7    A.    I asked them -- the first thing I asked

8    them was what's going on.

9    Q.    What did they tell you?

10    A.    They said that a woman said you took some

11    property of hers.

12    Q.    Any further conversation after that?

13    A.    Yes.  I said, "Well, what property?"  The

14    officer hollered that it's a gate or a fence or

15    something like that, of that nature.

16    Q.    Did they search the area for the property

17    they believed the lady was talking about?

18    A.    Yes.

19    Q.    Where did they search?

20    A.    Under the cars.  There is a small alleyway

21    there, I think.  Around the other side of the

22    building.

23    Q.    Did one of the officers stay with you

24    while the other searched or did they both search?

DURANT T. TISDALE

1      A.    One stayed with me while the other
2  searched.

3      Q.    Did he say anything to you at the time?

4      A.    He kept asking me where the gate is at.

5      Q.    Now, the officer that stayed with you, was
6  he white or black?

7      A.    He was white.

8      Q.    And his partner, what was his skin color?

9      A.    He was white.

10     Q.    So it was two white police officers.

11           Can you tell us whether one was
12  taller, shorter, heavy, skinny?  Any
13  differentiations between them?

14     A.    It's been a long time, but if I'm not
15  mistaken, they were pretty much about the same
16  height, built similar.  I know one of them had dark
17  hair.

18     Q.    How long was the one that left away from
19  you and the other officer?

20     A.    He just searched everything nearby within
21  like maybe 15, 20 feet range all the way around.

22     Q.    Okay.  What kind of neighborhood is this?
23  Is this residential, is this business, is it
24  commercial?  What is it?

1    A.    It's like a residential neighborhood, but

2    also it's small -- where I was located there is a

3    garage on the corner that do body fender work, I

4    guess, for automobiles.  That's where I was

5    standing at, but next to the garage is residential

6    housing where people live at.

7    Q.    You testified earlier that you asked the

8    officers if you could see a white shirt.

9          What did you mean by a white shirt?

10   A.    Like a lieutenant or captain or somebody.

11   Q.    Did they comply with that?

12   A.    No.  They told me ain't none here or

13   something.  It was a real sarcastic remark.  Then I

14   asked to speak to a detective.  I never spoke to

15   one of them.  They wouldn't let me see one of them

16   either.

17   Q.    When you asked to speak to a detective,

18   did you ask to speak to a detective when you were

19   out on the street?

20   A.    On the street.

21   Q.    Both requests were refused, whether it was

22   for a white shirt or lieutenant or a captain or a

23   detective, right?

24   A.    Yes.

**DURANT T. TISDALE**

1    Q.   Did the officers ever take you back to

2  this house where the grate was allegedly stolen

3  from to take a look at the grate?

4    A.   No.

5    Q.   So they took you from the corner where

6  they stopped you to where?

7    A.   The district.

8    Q.   Okay.  Did they take anything off of you,

9  such as tools or anything?

10    A.   No.

11    Q.   Did you have any tools on you?

12    A.   No.

13    Q.   Who was your supervisor for the Phillies

14  organization?  When you went to work, who did you

15  report to?

16    A.   I can't think of his last name.  His name

17  was Sam.

18    Q.   How long had you been working there?

19    A.   Since March of 2010.

20    Q.   The case itself after you were arrested,

21  were you brought to court each time it was listed?

22    A.   No.

23    Q.   Did you ever go to court for the case?

24    A.   No.

**DURANT T. TISDALE**

1      Q.    How did you find out that the case was

2   dismissed?

3      A.    I received a letter, legal mail, from the

4   court informing me that it was dismissed.

5      Q.    In reference to when you were talking to

6   the police officers and they were asking you about

7   the grate, did any of them ask you about a shopping

8   cart?

9      A.    One of them did.

10      Q.    And did you have a shopping cart with you?

11      A.    No.

12      Q.    Did they look for a shopping cart?

13      A.    Yes.

14      Q.    And were they able to find the shopping

15   cart?

16      A.    No.

17      Q.    Were you the only person on the corner at

18   the time?

19      A.    Yes.

20      Q.    How long were you on the corner prior to

21   noticing that this car pulled up and stopped across

22   the street?

23      A.    I might have been there about five or

24   maybe ten minutes tops.

**DURANT T. TISDALE**

1    Q.   When the police came, you told them you

2    were on parole?

3    A.   Yes.

4    Q.   Did the lady say anything when you were

5    arrested?

6    A.   She said something -- I can't recall

7    everything word for word, but I know she did make a

8    comment of you're going to jail for stealing.

9    Q.   She made that comment to you?

10   A.   Yes.  I remember the officers told her to

11   follow us to the district to fill out the

12   paperwork.

13   Q.   Did you notice the car following you?

14   A.   Yes.

15   Q.   By the way, counsel was asking you a

16   little bit earlier if you knew the police officers.

17        You said you didn't know the police

18   officers, correct?

19   A.   Right.  Not by name.

20   Q.   Well, did you recognize the police

21   officers?

22   A.   I know they was young.  They was --

23   Q.   Well, by "recognize," I mean did you ever

24   see them before?  Did you have --

**DURANT T. TISDALE**

1    A.   No.

2    Q.   So you didn't have any quarrels with these

3  two police officers?

4    A.   No.

5    Q.   They never arrested you before?

6    A.   No.

7    Q.   When you were taken in, did you ever ask

8  to see a detective again?

9    A.   Yes.

10    Q.   And were you given the opportunity to see

11  a detective?

12    A.   No.

13    Q.   So no statement was ever taken from you?

14    A.   No.

15    Q.   Now, the reason why your girlfriend --

16  what is her name, by the way?

17    A.   Annette Grover.

18    Q.   -- couldn't pay bail for you is because

19  you had a detainer from the state lodged against

20  you, correct?

21    A.   Yes.

22    Q.   That is because you were on parole for

23  robbery at the time?

24    A.   Yes.

**DURANT T. TISDALE**



1     Q.    And you told the police officers that?

2     A.    Yes.

3     Q.    So no bail was actually paid on your

4  behalf?

5     A.    Correct.

6            MR. McDERMOTT:  I have no other

7          questions.

8            MR. SHOTLAND:  Nothing further.

9          Thanks for your time.

10           (Deposition concluded at 2:41 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**DURANT T. TISDALE**

CERTIFICATION

- - -

6    I hereby certify that the testimony and
7  the proceedings in the aforegoing matter are
8  contained fully and accurately in the
9  stenographic notes taken by me, and that the
10 copy is a true and correct transcript of the
11 same.


*Donna M. Ray, RPR, CCR*
_____
DONNA M. RAY, R.P.R., C.C.R.
     License No. XI 02161


18    The foregoing certification does not apply to
19 any reproduction of the same by any means unless
20 under the direct control and/or supervision of the
21 certifying shorthand reporter.

- - -

                                                                        1

1            IN THE COURT OF COMMON PLEAS
           PHILADELPHIA COUNTY, PENNSYLVANIA
2                      -   -   -

3    DURANT TYRONE TISDALE    :   CIVIL ACTION
                    Plaintiff  :
4                               :
            V.                  :
5                               :
     CITY OF PHILADELPHIA-      :
6    LAW DEPARTMENT and         :
     PHILADELPHIA POLICE        :
7    OFFICER TIMOTHY GIBSON,:
     BADGE #4742               :
8    and                        :
     PHILADELPHIA POLICE        :
9    OFFICER DAVID SHERWOOD,:
     BADGE #714                :
10                 Defendants  :   NO. 15-cv-5209

11                      -   -   -

12               January 14, 2016

13                      -   -   -

14           Oral deposition of OFFICER TIMOTHY

15    GIBSON, taken pursuant to notice, was held

16    at the City of Philadelphia-Law Department,

17    1515 Arch Street, 14th Floor, Philadelphia,

18    Pennsylvania 19102, commencing at 2:45 p.m.,

19    on the above date, before Susan B. Berkowitz,

20    a Registered Professional Reporter and

21    Notary Public in the Commonwealth of

22    Pennsylvania.

23                      -   -   -

24

2

1     APPEARANCES:

2

3     MICHAEL I. McDERMOTT, ATTORNEY AT LAW
      BY:   MICHAEL I. McDERMOTT, ESQUIRE
4     1026 Winter Street
      Philadelphia, Pennsylvania 19107
5     Telephone:  (215) 925-9732
      E-mail:  mmcder1188@aol.com
6     Counsel for Plaintiff

7

8     CITY OF PHILADELPHIA - LAW DEPARTMENT
      BY:   AARON SHOTLAND, ESQUIRE
9     1515 Arch Street, Suite 14-A
      Philadelphia, Pennsylvania 19102
10    Telephone:  (215) 683-5434
      E-mail:  aaron.shotland@phila.gov
11    Counsel for Defendants

12

13    ALSO PRESENT:   OFFICER ROBERT WHITTAKER

14

15

16

17

18

19

20

21

22

23

24

55

3

1                    I N D E X

2    Testimony of:  Officer Timothy Gibson

3    By Mr. McDermott. . . . . . . . . 5, 39

4    By Mr. Shotland. . . . . . . . . . 39

5

6

7

8

9                    –   –   –

10                E X H I B I T S

11                    –   –   –

12

13   NO.           DESCRIPTION                PAGE

14

15   (There were no exhibits marked at this time.)

16

17

18

19

20

21

22

23

24

4

```
 1              DEPOSITION SUPPORT INDEX

 2

 3     Direction to Witness Not to Answer

 4     Page Line       Page Line          Page Line

 5     None

 6

 7

 8

 9     Request for Production of Documents

10     Page Line       Page Line          Page Line

11     None

12

13

14

15     Stipulations

16     Page Line       Page Line          Page Line

17      5     1-7

18

19

20

21     Question Marked

22     Page Line       Page Line          Page Line

23     None

24
```

57

OFFICER GIBSON                    5

1              (It is hereby stipulated and

2         agreed by and between counsel that

3         signing, sealing, filing and

4         certification are waived; and that

5         all objections, except as to the

6         form of questions, be reserved until

7         the time of trial.)

8                   -   -   -

9              OFFICER TIMOTHY GIBSON, after

10        having been duly sworn, was examined

11        and testified as follows:

12                  -   -   -

13             EXAMINATION

14                  -   -   -

15   BY MR. McDERMOTT:

16        Q.   Officer, once again, my name is

17   Michael McDermott.  I represent Durant

18   Tisdale in this civil action in which you

19   are actually one of the named defendants.

20   So I'm going to be asking you questions

21   today in reference to what we call a

22   deposition.  And I think you told me

23   earlier you never had a deposition before.

24        A.   No, I have not.

OFFICER GIBSON                    6

1          Q.    How long have you been a police
2    officer?
3          A.    It will be six years next month.
4          Q.    You read, write and understand
5    the English language?
6          A.    I do.
7          Q.    I take it you've testified in
8    cases in criminal court?
9          A.    That's correct.
10         Q.    So here, a lot of the rules are
11   the same.  There's a stenographer to my
12   right.  You've been sworn in.  I'm going to
13   be asking you questions.  So I'll ask that
14   you wait until I finish my question before
15   you answer, because it makes it easier for
16   the stenographer to take everything down.
17              Do you understand that?
18         A.    Yes.
19         Q.    If you don't understand my
20   question, say, I'm sorry, I don't understand
21   your question.  If you don't recall or
22   remember the information I'm seeking, just
23   tell me, I don't recall.
24         A.    Okay.

OFFICER GIBSON                    7

1          Q.    And then maybe if you do recall

2     something later in the deposition, if

3     something comes into your mind, just let us

4     know and we can go back to it.

5          A.    Okay.

6          Q.    Does that work for you?

7          A.    Yes.

8          Q.    Have you used any medication,

9     narcotics or alcohol in the last 24 hours

10    that would keep you from understanding

11    anything I ask you today?

12         A.    No.

13         Q.    You're a Philadelphia police

14    officer?

15         A.    That's correct.

16         Q.    How long have you been a police

17    officer?

18         A.    It will be six years next month.

19         Q.    What is your current assignment?

20         A.    27 District.

21         Q.    What does that entail?

22         A.    10th to Kelly, Poplar to Lehigh.

23         Q.    So your normal tour of duty

24    consists of what?

OFFICER GIBSON                    8

1          A.     Me and my partner, Officer

2    Whittaker, are what they call 6p to -- 10p

3    to 6 -- or 10a to 6p.

4          Q.     So you're generally patrolling?

5          A.     Yeah, we are.

6          Q.     Are you guys on bicycles or are

7    you in cars?

8          A.     Sometimes on bikes, sometimes in

9    a patrol vehicle.

10          Q.     Back on the date of this

11    incident, which was July 5th, 2013, was the

12    same all true?

13          A.     We were in a marked police

14    vehicle.

15          Q.     But you were on the same

16    assignment, working together?

17          A.     Oh, yeah.

18          Q.     And who was the driver and who

19    was the radio man?

20          A.     I'm always the recorder.  Office

21    Whittaker is the driver.

22          Q.     Now, on that night you and

23    Officer Whittaker arrested Durant Tisdale.

24    Do you recall that?

OFFICER GIBSON

9

1      A.     I recall that, after it was
2  brought to my attention, and looking at the
3  paperwork.  I did not remember him by name.
4      Q.     As you're talking to me, you
5  have a lot of paperwork in front of you,
6  which includes Mr. Tisdale's arrest photo,
7  right?
8      A.     That's correct.
9      Q.     And I noticed that you glanced
10  over that way, at least.  Did you see his
11  picture?
12      A.     I did.
13      Q.     Do you recognize it?
14      A.     Yes, I do.
15      Q.     And you recognize him from that
16  night?
17      A.     I do.
18      Q.     Is that how he looked on that
19  night?
20      A.     As far as I recall.
21      Q.     And you're patrolling.  I take
22  it that a radio call comes out at some point
23  in reference to the eventual arrest of Mr.
24  Tisdale?

OFFICER GIBSON                    10

1          A.    That's right.

2          Q.    What was the radio call?

3          A.    It was a theft in progress on

4     the 2100 block of North Delhi.

5          Q.    You're referring to the 48?

6          A.    I was.

7          Q.    By the way, who prepared the 48?

8          A.    That's my handwriting.

9          Q.    We were just sitting here with

10    the detective, and he was reviewing the

11    paperwork.  But the actual 48 was prepared

12    by you?

13         A.    That's correct.

14         Q.    And that's in handwriting or

15    printing?

16         A.    That's my handwriting, that's

17    correct.

18         Q.    Tell us what the 48 states in

19    the narrative.

20         A.    Read it off directly?

21         Q.    Yes.

22         A.    Police received an R/C, which is

23    what I use for radio call; for a T-I-P, which

24

1    I use for theft in progress, at the

2    ABV, which would be the above location.

3    Flash given was a black male with a black

4    shirt, white hat.  Police observed below

5    witness and below offender at 1000 block

6    of Arizona.  Witness stated to police

7    that she observed offender take a white

8    grate to basement window from above

9    complainant property at the above

10   location.  Male placed under arrest,

11   transported to East Detectives.  Police

12   surveyed area for a grate, with negative

13   results.

14        Q.    Let's start with the above

15   location.  What was the location of the

16   theft?

17        A.    According to the witness, it

18   would have been 2220 North Delhi.

19        Q.    On the night of my client's

20   arrest, did you go to that address?

21        A.    I don't recall going to that

22   address; no.

23        Q.    Why didn't you go to the

24   address?

OFFICER GIBSON                    12

1          A.     Because I was with the defendant

2     and, also, the witness.  I don't know if my

3     partner did, or any other police personnel

4     did.

5          Q.     If you have a person under

6     arrest and they're in the patrol car, you're

7     out talking to the witness, is it abnormal

8     for your partner to leave you and go either

9     search for evidence or go see a location, a

10    crime scene?

11         A.     I guess it would depend on the

12    situation.

13         Q.     In this situation, you're saying

14    that that may have occurred, but I'd have to

15    ask Officer Whittaker?

16         A.     That's correct.

17         Q.     It does talk about searching

18    the area.  And do you recall, yourself,

19    searching the area?

20         A.     I recall walking down the 1000

21    block of Arizona to look for the grate,

22    which was the direction in which he was

23    coming from.

24         Q.     And that direction was given to

1    you by Brenda Lee?

2           A.    Well, no.  He was walking west

3    on the 1000 block of Arizona.

4           Q.    When you first saw him?

5           A.    Yeah, that's correct.

6           Q.    Okay.

7           A.    And he was just approaching --

8    it would be the intersection of Arizona and

9    11th Street.

10          Q.    Okay.

11          A.    So he was walking westbound.

12          Q.    Okay.  At the intersection of

13   Arizona and 11th Street, are there any bus

14   routes there or trolley routes?

15          A.    I can't recall if it's Arizona.

16   I think it's actually -- the bus would be at

17   11th and York, which would be half a block

18   up.  I think that's the closest one.

19          Q.    But the bus comes straight past

20   Arizona on --

21          A.    It goes northbound on -- past

22   Arizona.

23          Q.    So when you saw my client

24   walking, were you with the complainant or --

OFFICER GIBSON                        14

1    I'm sorry -- with the witness, Brenda Lee?

2            A.    No, we were not.

3            Q.    So you see my client walking,

4    but you don't go to stop him, do you?

5            A.    We stopped him.

6            Q.    Based on what?

7            A.    Based off the flash information

8    given over the police radio.

9            Q.    Give that to us again.

10           A.    It was a black male wearing a

11   black hat and a white -- I'm sorry, a white

12   hat and black shirt.

13           Q.    Was Mr. Tisdale wearing a black

14   shirt?

15           A.    Yeah.  I do recall that.

16           Q.    Was he wearing a white hat?

17           A.    As far as I recall; yes.

18           Q.    Did you put anything in your

19   report stating that he was, in fact, wearing

20   a white hat?

21           A.    In my 48A it gives the flash

22   information; why we stopped him.  If I had

23   the 48A in front of me, if one was prepared,

24   and I don't recall if one was prepared or

67

1    not, that would clearly state what he was

2    wearing.

3            Q.    For the record, tell me what a

4    48A is.

5            A.    48A is just the information of a

6    male that's stopped by police and the reason

7    they would be stopped.  I don't know if one

8    was prepared for this or not.

9            Q.    And how long have they been

10   actually preparing the 48As?

11           A.    I do not know.

12           Q.    Have they always been there

13   since you've been in the service of being a

14   Philadelphia police officer?

15           A.    That's correct.

16           Q.    So they're at least six years

17   old?

18           A.    Yeah.

19           Q.    So, obviously, then, on July 5th

20   of 2013, that's something that may have been

21   prepared?

22           A.    It may have been prepared.

23   Sometimes when the male is arrested based

24   off of flash information, sometimes one is

OFFICER GIBSON                    16

1    not prepared.

2         Q.    Let me show you what's commonly

3    referred to as the 229, the Biographical

4    Information Report.

5         A.    Sure.

6         Q.    Do you recognize the handwriting

7    on that report?

8         A.    No, I do not.

9         Q.    So it's not your handwriting?

10        A.    It's not.

11        Q.    And do you recognize it as being

12   Officer Whittaker's handwriting?

13        A.    I don't think so.

14        Q.    Who generally fills them out?

15        A.    The transporting officer, which

16   we were not.  We actually transported your

17   client, Durant Tisdale, to East Detectives.

18   So we would have came over and transported

19   the witness and then would have went down to

20   the cell and filled this out.

21        Q.    Wait.  I'm sorry.  You said

22   that, usually, the person who transports him

23   to --

24        A.    I mean -- I had that switched

69

OFFICER GIBSON                          17

1    up.   I think we transported the witness and

2    they transported -- what I'm trying to say

3    is, I don't know if this is Officer

4    Whittaker.

5         Q.    Okay.   So you think --

6         A.    I don't know if he did this or

7    if somebody else helped us transport Durant

8    Tisdale or Brenda Lee.

9         Q.    Okay.

10        A.    Sorry.

11        Q.    But your recollection -- your

12   best recollection, sitting here today, is

13   that you think you transported Brenda Lee?

14        A.    Now that I'm thinking about it,

15   I don't recall.   I don't know.

16        Q.    So let's get down to this.   What

17   does this have on it?   What kind of

18   information is the Philadelphia Biographical

19   Information Report looking for?

20        A.    Male's name, date of birth,

21   height and weight, approximately, address.

22        Q.    Is any information in there?

23        A.    Yes.

24        Q.    What information is in there?

OFFICER GIBSON                    18

1           A.    His last name, his first name,

2    date of birth.  He's a male, black,

3    five-nine, 185, hair color gray, eye color

4    brown, medium complexion, medium build, no

5    glasses, goatee for facial hair.  He's

6    single.  I think that says district

7    residence would be the 39th, because his

8    address is 301 West Erie Street, Philadelphia

9    PA.  That location is a house.  He lives

10   alone.

11           Do you want me to read off his

12   Social Security number?

13           Q.    No.  That's not -- no.

14           A.    Occupation says NA.  Employer

15   address, NA.  Place of birth, Philadelphia,

16   PA.

17           Q.    Okay.  Now, do they have a spot

18   there where it would be filled in for a

19   description of the clothing worn by the

20   defendant?

21           A.    It does.  It has a spot for

22   clothing description.

23           Q.    And is that blank on that form?

24           A.    It is.

OFFICER GIBSON                              19

1              Q.    And you can't tell us why that

2    is, because you didn't prepare the report?

3              A.    That's correct.

4              Q.    Now, was there any physical

5    evidence turned in by you or any other

6    officer, that you're aware of, in reference

7    to this arrest?

8              A.    No, not that I'm aware of.

9              Q.    And 1000 Arizona, that block,

10   are you familiar with it?

11             A.    Yeah.

12             Q.    Okay.  Are you familiar with the

13   neighborhood in which that block, and also

14   the block of 2200 North Delhi, is located?

15             A.    That's correct.

16             Q.    What kind of neighborhood is

17   that?  Is that a commercial spot?  Is that a

18   residential spot?

19             A.    It's primarily residential.

20             Q.    And you had patrolled it for

21   some time as of July 5th, 2013, right?

22             A.    That's correct.

23             Q.    What kind of people live there?

24   Is it all white?  Is it all black?  Is it a

1    mixture?  Does it have Asians?  Does it have

2    a lot of people, as far as you know from

3    your patrol?

4              MR. SHOTLAND:  If you can answer

5         it.

6              THE WITNESS:  I mean, I don't

7         know how I can answer that.

8    BY MR. McDERMOTT:

9         Q.   Well, I mean, as far as you know

10   from being there on bike and in a patrol

11   car, do black people live there?

12        A.   That's correct.

13        Q.   And white people live there?

14        A.   I've seen -- yes.

15        Q.   By the way, Brenda Lee, was she

16   white?  Black?

17        A.   She was, I believe, a black

18   female, if I recall correctly.

19        Q.   And Brian Stewart, who I believe

20   it was reported that you spoke to on the

21   phone --

22        A.   Yes.

23        Q.   -- you never saw him, right?

24        A.   Can I refer to this (indicating)?

OFFICER GIBSON                    21

1          Q.    Sure.

2          A.    I believe I did talk to him on

3    the phone.

4          Q.    Okay.

5          A.    (Witness reading.)  Yeah.  I

6    think I did talk to him on the phone.

7    That's correct.

8          Q.    So it's not unusual that a black

9    person, black male, would be walking down

10   the 1000 block of Arizona Street?

11         A.    No.

12         Q.    What time of night was this?

13         A.    Can I refer to this (indicating)?

14         Q.    Sure.  Your time out may be on

15   the --

16         A.    The time out is on the 48.  It

17   says 11:02 p.m.

18         Q.    So you're out on July 5th at

19   11:02 p.m.?

20         A.    That's correct.

21         Q.    And that time of night wouldn't

22   be unusual for a black person to be walking

23   down the street?

24         A.    No.

1          Q.    And you stopped Mr. Tisdale

2    because you say that he fit the description

3    that you have in the 48?

4          A.    That's correct.

5          Q.    Okay.

6          A.    Which was provided by police

7    radio.

8          Q.    And what was it?

9          A.    For a black male with a black

10   shirt and white hat.  That's what I recall

11   from that radio call.

12         Q.    What kind of hat was it?

13         A.    I don't recall.

14         Q.    So there wasn't a height

15   description given.  There wasn't a weight

16   description given, right?

17         A.    If there was, I don't recall.

18         Q.    But you didn't write anything

19   down in your 48?

20         A.    I did not.

21         Q.    And you write down what's given

22   over the police radio?

23         A.    I'm sorry?

24         Q.    You write down what description

1    is given over the police radio?

2             A.     That's correct.

3             Q.     So when did you actually fill

4    out the 48?

5             A.     Before going to Detectives,

6    after the incident.

7             Q.     Out on the street or back in the

8    station?

9             A.     I wrote this, I believe, on the

10   street.

11            Q.     So you have the 48s with you

12   in this car?

13            A.     Yes, in the car.

14            Q.     So that would be fresh in your

15   memory?

16            A.     That's correct.

17            Q.     What time did you go in?  I know

18   that a 48 has a time out and a time in.

19            A.     Time in?

20            MR. SHOTLAND:  It's just the

21        next --

22            THE WITNESS:  11:25.

23   BY MR. McDERMOTT:

24            Q.     You wrote this all within 20

76

OFFICER GIBSON                          24

1    minutes?

2            A.    That's correct.

3            Q.    So you would have remembered at

4    that time what the description was?

5            A.    That's correct.

6            Q.    Okay.   Was Mr. Tisdale carrying

7    anything?

8            A.    Not that I recall.

9            Q.    Did Mr. Tisdale have any tools

10   on him?

11           A.    From what I recall, no.

12           Q.    Was he pushing a shopping cart?

13           A.    If he was, I don't recall that.

14           Q.    So what you're telling me is you

15   stopped Mr. Tisdale?

16           A.    That's correct.

17           Q.    You're in uniform?

18           A.    That's correct.

19           Q.    Officer Whittaker is in uniform?

20           A.    That's correct.

21           Q.    How do you approach him?  Do you

22   just pull up to where he is and ask him to

23   stop?

24           A.    As far as I recall, we stopped

1    him at Arizona and 11th.

2            Q.    Okay.  But you're in your car?

3            A.    That's correct.

4            Q.    So you put down your window and

5    say stop?  You get out and start talking to

6    him?

7            A.    I don't recall if we pulled up

8    next to him, in front of him.  I don't

9    recall.

10           Q.    But you're there in uniform in

11   the car somewhere.  Do you have the lights

12   on in the car?

13           A.    No.

14           Q.    Okay.  When Brenda Lee first

15   comes onto the scene, how do you become

16   aware that she's there?

17           A.    If I can refer to this.

18   (Witness reading.)  After we stopped Mr.

19   Tisdale, Brenda Lee came up and stated that

20   she observed Mr. Tisdale take the grate from

21   2220 North Delhi.

22           Q.    And was she on foot?  Was she

23   in a car?

24           A.    I believe I recall the first

OFFICER GIBSON                    26

1      time I saw her she was on foot.

2                Q.      Okay.

3                A.      At least walking towards us.  I

4      don't know if she drove there or --

5                Q.      And she told you that she

6      followed him?

7                A.      That is correct.  She stated --

8      well, to me, she stated that she observed

9      him take the grate from the property.  I

10     don't remember her saying she followed him,

11     or she came around the block and saw him.  I

12     didn't get that into it with her.

13               Q.      Did you ask her where the grate

14     is?

15               A.      I don't recall if I did.

16     However, we did survey for it.  So I don't

17     know.  I don't recall.

18               Q.      Did you ask Mr. Tisdale where

19     the grate was?

20               A.      I don't recall.

21               Q.      Did he state anything to you

22     about the grate?

23               A.      Not that I recall.

24               Q.      What, if anything, did he state

OFFICER GIBSON                    27

1    to you?

2            A.      Nothing, from what I can recall.

3            Q.      He just stated what?

4            A.      Nothing that I can recall, off

5    the top of my head.

6            Q.      When did you actually put him in

7    handcuffs, you or Officer Whittaker,

8    whichever one did it?

9            A.      I believe we placed him in

10   custody after learning the information from

11   Mrs. Lee.

12           Q.      When you first stopped him,

13   Brenda Lee was not on site?

14           A.      I believe she was behind,

15   walking up.  It was relatively quick, from

16   what I remember.  I don't recall how quick,

17   but I remember it was relatively quick.

18           Q.      Why did you stop him?

19           A.      Once again, based off of flash

20   information given by police radio.

21           Q.      And what was your thinking about

22   the grate?

23           A.      What do you mean?

24           Q.      I mean, didn't it cross your

1    mind that, I'm being told that this man

2    stole a grate and put it in a shopping cart,

3    and he's pushing it down the block?  Didn't

4    you think to yourself, what happened to the

5    grate, where is the grate?

6          A.    Well, that's why we surveyed the

7    area with negative results.  And at that

8    point, based on the witness' statement to

9    us, we placed him in custody and took the

10   male to East Detectives for further

11   processing or investigation at that point.

12         Q.    Well, a lot of times in court,

13   in reference to location and things, we talk

14   about location, and it's often said it was

15   the 1000 block of Arizona Street or the 100

16   block of Market Street.

17         A.    Sure.

18         Q.    They're only talking about one

19   block, the 1000 block, right?

20         A.    The 1000 block of Arizona.

21               MR. SHOTLAND:  Objection to

22         form.  What's the question?

23               MR. McDERMOTT:  Well, I'm going

24         to ask him a question.

OFFICER GIBSON                    29

1    BY MR. McDERMOTT:

2            Q.    So you already surveyed that one

3    block?

4            A.    No.

5            Q.    What else did you survey?

6            A.    I believe while we were

7    responding to the radio call, we were -- I

8    believe we were traveling north on 11th

9    Street when we observed the male.

10           Q.    Okay.  Did you leave the 1100

11   block?

12           A.    That was -- no.  11th Street,

13   like I stated earlier, runs northbound.

14           Q.    It's one way?

15           A.    That's correct.  And Arizona

16   runs right into 11th Street.

17           Q.    So you're going northbound on

18   11th Street?

19           A.    As far as I recall; yes.

20           Q.    And you said that the defendant

21   was walking westbound on Arizona?

22           A.    As far as I recall.

23           Q.    So the first time you saw him

24   was when you got to the intersection?

OFFICER GIBSON                    30

1           A.    That's correct.

2           Q.    And he's up on your right?

3           A.    He would have been on our right;

4    yeah.

5           Q.    So you had to make a right-hand

6    turn and then you come in contact with him?

7           A.    Once again, like I said, how we

8    approached him -- I don't recall if we

9    turned to face him, or we just stopped and I

10   got off on the side.  I don't recall if he

11   was at the intersection of Arizona and 11th

12   Street, which is the 1000 block of Arizona,

13   which is where we stopped him for

14   investigation.

15          Q.    Okay.  So I guess the

16   appropriate question is:  From the time you

17   saw him, until the time you were with him,

18   there was no great distance to cross?

19          A.    No, not at all.

20          Q.    And when you're sitting there,

21   looking to your right and you see him, and

22   you get out of your car, you don't see this

23   lady walking?  Brenda Lee?

24          A.    Well, I recall going to stop

1   him; and then once we stopped him, Mrs. Lee

2   coming up and telling us what she saw.

3          Q.   So then the question is:   What

4   was your survey area, for purposes of

5   looking for a shopping cart and/or a grate?

6          A.   I don't recall.  It was three

7   years ago.  I remember going northbound on

8   11th Street and then approaching the male

9   for investigation.

10          Q.   So your survey was done on foot

11   or in a car?

12          A.   We were in a marked police

13   vehicle.

14          Q.   So you were driving around

15   looking for it?

16          A.   My partner, Officer Whittaker,

17   was driving, and I was in the recorder seat.

18          Q.   After you arrested him, he's in

19   the car and you're looking for the grate?

20          A.   I said we surveyed, with

21   negative results.  I don't want to --

22          Q.   I know.  But I mean --

23          A.   I remember walking down the

24   street at that point.  I don't know what

1    other police personnel surveyed where.  I

2    remember walking down at one point.  I

3    didn't find it.  Nobody else found anything.

4    That's why I stated "survey done with

5    negative results."

6          Q.    Okay.  And that's all I'm

7    asking, is how far you actually went.

8          A.    That's all I know.

9          Q.    So, for you, it was on foot,

10   walking?

11         A.    I walked down Arizona and came

12   right back.

13         Q.    So you didn't even reach the

14   next intersection?

15         A.    If I did, I don't remember.

16         Q.    And you brought Mr. Tisdale into

17   the precinct?

18         A.    Once again, I don't recall who

19   transported him.

20         Q.    I apologize.  I understand that.

21   I mean, at this point after arresting him,

22   based on what she told him, you take him

23   into the precinct, or go along with people

24   that are taking him into the precinct?

OFFICER GIBSON                          33

1    Everybody comes back --

2          A.    That's right.  Due to the

3    occurrence of this, it would have occurred

4    at 2220 North Delhi.  We took him to East

5    Detectives.

6          Q.    So the only thing that you had

7    to rely on, that he was, in fact, the person

8    that stole something was what?  Ms. Brenda

9    Lee's statement?

10         A.    That's correct.

11               MR. SHOTLAND:  Objection.

12               You can answer.

13               THE WITNESS:  That's correct.

14   BY MR. McDERMOTT:

15         Q.    And you had no other physical

16   evidence to support her claims?

17         A.    Other than why we stopped the

18   male for the black shirt, white hat; due to

19   information given over police radio, and

20   what Mrs. Lee -- is it Lee -- yeah, stated

21   to us.

22         Q.    And being in the general area?

23         A.    Well, we were in the general

24   area because of the radio call.

OFFICER GIBSON                    34

1        Q.    No.   I mean my client being in
2    the general area.
3        A.    Where we stopped him for
4    investigation.   That's right.
5        Q.    How far is that from the 2200
6    block of North Delhi?
7        A.    I'd say, approximately, four
8    blocks.   Because like I stated earlier, it's
9    closer to 11th and York.   And 2200 Delhi
10   would be north of Susquehanna.   I can't
11   remember if Delhi is between 9th and 10th
12   or 8th and 9th.
13       Q.    So you get the radio call at
14   11:05?
15       A.    My 48 says 11:02.
16       Q.    11:02.
17       A.    I don't recall.   But if the 48
18   says 11:02...
19       Q.    What time is it when you spot
20   Mr. Tisdale?
21       A.    I don't recall.
22       Q.    Is he sweating or anything?
23       A.    I don't recall.
24       Q.    Do you recall whether it was a

1    hot night, warm night, cold night?

2           A.    I don't recall.  It's three

3    years ago.

4           Q.    What training have you had

5    through the police department for probable

6    cause?

7           A.    For probable cause?

8           Q.    Yes.

9           A.    Based off what we learned in the

10   Philadelphia Police Academy.

11          Q.    What did they tell you?

12          A.    About probable cause?

13          Q.    Yes.

14          MR. SHOTLAND:   To the best of

15          your recollection.

16          THE WITNESS:   By definition, I

17          don't recall, but -- I really don't

18          know what you're asking here, sir.

19   BY MR. McDERMOTT:

20          Q.    Well, do you know what probable

21   cause is?

22          A.    Yes.

23          Q.    Okay.

24          A.    It's reason to believe that a

1    crime is committed.

2         Q.    How did you learn that?

3         A.    Based on the statement that Mrs.

4    Lee gave to us.

5         Q.    I mean, how did you learn the

6    definition that you just gave us?

7         A.    At the Academy.

8         Q.    And what did that training

9    consist of?

10        A.    33 weeks.

11        Q.    And how much of that 33 weeks

12   was spent on probable cause?

13        A.    I don't know.  I'm not an

14   instructor.

15        Q.    Was it more than one class?

16        A.    Yes.

17        Q.    Was it more than one week?

18        A.    There was 33 weeks.  I don't

19   know what was spent on probable cause.

20        Q.    But the best definition you can

21   give from your training is what you just

22   gave us?

23        A.    That's correct.

24        Q.    And based on that training, her

1    telling you that she saw him do something

2    was enough for you?

3         A.    Based off of my training and my

4    experience, yes, to take it, at least, to

5    East Detectives.

6         Q.    What experience comes into play?

7         A.    Three years, prior to this

8    incident, being an officer.

9         Q.    Well, what experience did you

10   have, that arresting somebody for walking

11   down the street that has a black shirt and a

12   white hat on --

13              MR. SHOTLAND:   Objection.

14   BY MR. McDERMOTT:

15        Q.    How many times have you arrested

16   people for somebody saying they did

17   something without any further evidence?

18        A.    Multiple times.

19        Q.    Multiple times?

20        A.    That's correct.

21        Q.    Did you go to court for this?

22        A.    I believe so.

23        Q.    Did you ever testify?

24        A.    I don't recall.

OFFICER GIBSON                    38

1          Q.    Did you ever see Brenda Lee
2     again?
3          A.    Not that I recall.
4          Q.    Did you ever meet Brian Stewart
5     or see him in court?
6          A.    I never was introduced to him;
7     no.
8          Q.    You're aware that Mr. Tisdale's
9     case was dismissed --
10          A.    I've heard.
11          Q.    -- for lack of prosecution?
12          A.    Okay.
13          Q.    You've had some complaints
14     brought against you before?
15              MR. SHOTLAND:  Neither of those
16          have anything to do with an arrest
17          or a false arrest or malicious
18          prosecution.  I just don't know how
19          they're relevant.
20              MR. McDERMOTT:  Give me one
21          minute.  I didn't look at it.
22              MR. SHOTLAND:  Take a look at
23          it.  They're two off-duty incidents.
24              (Counsel reading the document.)

1           MR. McDERMOTT:  I have no

2       questions, based on what I've had

3       the opportunity to see.  So I have

4       no further questions.

5           Thanks, Officer.

6           MR. SHOTLAND:  I do, just very

7       briefly.

8                   -   -   -

9               EXAMINATION

10                  -   -   -

11  BY MR. SHOTLAND:

12      Q.   You spoke with Brenda Lee at the

13  arrest scene?

14      A.   I did.

15      Q.   Did she give you any reason to

16  believe that she was lying to you?

17      A.   No, she did not.

18          MR. SHOTLAND:  That's my only

19      question.

20                  -   -   -

21              EXAMINATION

22                  -   -   -

23  BY MR. McDERMOTT:

24      Q.   You never asked her what he did

1    with the grate?

2         A.    Not that I recall; no.

3         Q.    In your experience as a

4    Philadelphia police officer, what does your

5    experience say that if you stole a grate it

6    has to be somewhere?

7         A.    Which is why I surveyed, with

8    negative results.

9         Q.    But wouldn't it be your

10   experience and common sense to tell you,

11   hey, let's ask the witness who saw him take

12   it?

13        A.    Wouldn't it be common sense to

14   believe that from the 2200 block of Delhi

15   and Arizona that he could have put that

16   grate anywhere?

17        Q.    Such as where?

18        A.    I don't know.

19        Q.    But if somebody is following

20   him, still, wouldn't it be reasonable and

21   common sense to ask an eyewitness, Did you

22   see where he put the grate?

23        A.    You would have to ask Mrs. Lee

24   that.  I don't know if she followed him the

1    whole way.

2         Q.   I'm asking why you wouldn't ask

3    that question.

4              MR. SHOTLAND:  Objection.  He

5         didn't say he didn't ask her.  He

6         said he didn't remember.  There's a

7         difference.

8    BY MR. McDERMOTT:

9         Q.   You don't recall asking her?

10        A.   I don't recall if I did.

11        Q.   But don't you think that with

12   three years' experience on the job, you

13   would ask a witness, Hey, do you know what

14   he did with the grate?

15             MR. SHOTLAND:  Objection.

16             THE WITNESS:  Yes.  But, once

17        again, I don't recall if I asked her

18        that.

19   BY MR. McDERMOTT:

20        Q.   Okay.  Let me see your statement.

21        A.   Sure.

22        Q.   Thanks.  In this, you have:  I

23   was working with my partner, Police Officer

24   Whittaker, in full uniform, and operating a

OFFICER GIBSON                    42

1    marked police vehicle.  We received a radio

2    call of a theft in progress from 2200 Delhi.

3              Right?

4         A.    That's correct.

5         Q.    Flash information.  Flash given

6    was a black male wearing a black shirt and

7    white hat, last seen in the area of 10th and

8    Dakota.

9              Where is Dakota?

10        A.    I can't recall if it's a

11   half-block south or north of Arizona.

12        Q.    Okay.  Well, Arizona runs west

13   and east, right?

14        A.    No.  They're one-way streets.  I

15   forget if Dakota runs east or west, and

16   Arizona -- they run -- one goes east and one

17   goes west.  I don't recall which one is

18   which.

19        Q.    So it's either --

20        A.    But they're both, I believe,

21   one-way streets.

22        Q.    So it's either south or north?

23        A.    No.  They both -- no.  Both

24   Dakota and Arizona would either run east or

1    west.   I just don't remember exactly which

2    one is east and which one is west.

3            Q.    Where is --

4            A.    They're both perpendicular to

5    11th Street.

6            Q.    Where is 10th and Dakota in

7    reference to 2200 North Delhi and 11 -- or

8    1000 Arizona?

9            A.    Well, like I said, Dakota is

10   either -- I can't remember if it's half a

11   block north or south of Arizona.  But that

12   would be like -- 10th and Dakota would be

13   like the 10th and York area.

14           Q.    And then it says:  We surveyed

15   the area and observed the defendant and

16   witness at 11000 Arizona Street.

17           A.    No.  1000.

18           Q.    I'm sorry.  1000 Arizona.

19                 "Upon investigation, the witness

20   stated to police that she observed the

21   defendant take a white grate from the

22   basement window at 2220 Delhi Street."

23                 And based on reading that,

24   you're telling me you don't recall whether

OFFICER GIBSON                          44

1    you asked her what he did with the grate?

2          A.     That's correct.

3                 MR. McDERMOTT:   I have no other

4          questions.

5                 MR. SHOTLAND:   Nothing.

6                 (Witness excused.)

7                       -   -   -

8                 (Whereupon, the deposition

9          concluded at 3:15 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

45

```
1                    CERTIFICATE
2          I HEREBY CERTIFY that the witness was
3     duly sworn by me and that the deposition is
4     a true record of the testimony given by the
5     witness.
6
7
8
9
          ----------------------------------
10        Susan B. Berkowitz, a
          Registered Professional Reporter
11        and Notary Public
          Dated:  January 25, 2016
12
13
14
15
16
17             (The foregoing certification
18     of this transcript does not apply to any
19     reproduction of the same by any means,
20     unless under the direct control and/or
21     supervision of the certifying
22     reporter.)
23
24
```

98

1

 1          IN THE COURT OF COMMON PLEAS
           PHILADELPHIA COUNTY, PENNSYLVANIA
 2                  -    -    -

 3   DURANT TYRONE TISDALE   :   CIVIL ACTION
                Plaintiff    :
 4                           :
           V.                :
 5                           :
     CITY OF PHILADELPHIA-    :
 6   LAW DEPARTMENT and       :
     PHILADELPHIA POLICE      :
 7   OFFICER TIMOTHY GIBSON,  :
     BADGE #4742              :
 8   and                     :
     PHILADELPHIA POLICE      :
 9   OFFICER DAVID SHERWOOD,  :
     BADGE #714              :
10          Defendants   :   NO. 15-cv-5209

11                  -    -    -

12          January 14, 2016

13                  -    -    -

14          Oral deposition of DETECTIVE DAVID

15   SHERWOOD, taken pursuant to notice, was held

16   at the City of Philadelphia-Law Department,

17   1515 Arch Street, 14th Floor, Philadelphia,

18   Pennsylvania 19102, commencing at 2:15 p.m.,

19   on the above date, before Susan B.

20   Berkowitz, a Registered Professional

21   Reporter and Notary Public in the

22   Commonwealth of Pennsylvania.

23                  -    -    -

24

2

1    APPEARANCES:

2


3

     MICHAEL I. McDERMOTT, ATTORNEY AT LAW
4    BY:   MICHAEL I. McDERMOTT, ESQUIRE
     1026 Winter Street
5    Philadelphia, Pennsylvania 19107
     Telephone:  (215) 925-9732
6    E-mail:  mmcder1188@aol.com
     Counsel for Plaintiff
7

8

     CITY OF PHILADELPHIA - LAW DEPARTMENT
9    BY:   AARON SHOTLAND, ESQUIRE
     1515 Arch Street, Suite 14-A
10   Philadelphia, Pennsylvania 19102
     Telephone:  (215) 683-5434
11   E-mail:  aaron.shotland@phila.gov
     Counsel for Defendants
12

13

     ALSO PRESENT:   OFFICER ROBERT WHITTAKER
14

15

16

17

18

19

20

21

22

23

24

3

```
 1                    I  N  D  E  X

 2    Testimony of:   Detective David Sherwood

 3    By Mr. McDermott.  .  .  .  .  .  . 5, 25, 36

 4    By Mr. Shotland.  .  .  .  .  .  .  . 24, 36

 5

 6

 7                       —   —   —

 8                 E  X  H  I  B  I  T  S

 9                       —   —   —

10

11    N O.           D E S C R I P T I O N           P A G E

12

13    (There were no exhibits marked at this time.)

14

15

16

17

18

19

20

21

22

23

24
```

**101**

4

```
 1              DEPOSITION SUPPORT INDEX

 2

 3      Direction to Witness Not to Answer

 4      Page  Line        Page  Line         Page  Line

 5      None

 6

 7

 8

 9      Request for Production of Documents

10      Page  Line        Page  Line         Page  Line

11      None

12

13

14

15      Stipulations

16      Page  Line        Page  Line         Page  Line

17       5    1-7

18

19

20

21      Question Marked

22      Page  Line        Page  Line         Page  Line

23      None

24
```

DET. SHERWOOD                          5

1              (It is hereby stipulated and

2          agreed by and between counsel that

3          signing, sealing, filing and

4          certification are waived; and that

5          all objections, except as to the

6          form of questions, be reserved until

7          the time of trial.)

8                    -   -   -

9              DETECTIVE DAVID SHERWOOD, after

10         having been duly sworn, was examined

11         and testified as follows:

12                   -   -   -

13                EXAMINATION

14                   -   -   -

15    BY MR. McDERMOTT:

16         Q.   My name, for the record, is

17    Michael McDermott.  I represent Durant

18    Tisdale.  Today we're going to be taking

19    your deposition.  So I'll give you some

20    brief instructions.

21              Detective, have you given a

22    deposition before?

23         A.   Yes.

24         Q.   So you know that it's an oral

103

DET. SHERWOOD                    6

1    answer and oral response type of thing?

2         A.   Yes.

3         Q.   I know that you were working

4    last night.  But outside of that, have you

5    taken any medication or narcotics, or

6    anything that would keep you from

7    understanding anything that I'll be asking

8    you?

9         A.   No.

10         Q.   If you have any questions of me

11    during this, please stop me.  You can either

12    talk to your attorney about them, or me

13    about them.  We'll get through them so that

14    we can go on with the deposition.

15              If you don't understand the

16    question, tell me you don't understand the

17    question.  I'll repeat it or rephrase it in

18    a way that you will.  If I'm looking down

19    and I'm mumbling, because I'm looking down

20    at a sheet or something, stop me and tell me

21    you can't hear me.  I'll repeat the question.

22              Okay?

23         A.   Okay.

24         Q.   Any reason why we can't go on

104

DET. SHERWOOD                              7

1    with the deposition at this time?

2                   MR. SHOTLAND:  One instruction I

3              think will help.  You have to wait

4              until he's finished asking his

5              question before you begin your

6              answer, because the court reporter

7              can't take you both down at the same

8              time.

9                   THE WITNESS:  Yes.

10   BY MR. McDERMOTT:

11             Q.   The first question is:  Where

12   are you currently working?  What's your

13   assignment?

14             A.   My assignment is East Detectives.

15             Q.   Sitting here today, if I told

16   you I represent Durant Tisdale, does that

17   name bring back any recollection of the

18   night he was arrested?

19             A.   Not really.

20             Q.   I see that in front of you you

21   have some reports that I'm sure counsel has

22   given you.  Did you review them --

23             A.   Yes.

24             Q.   -- prior to this?

DET. SHERWOOD                          8

1          A.    Yes.

2          Q.    Did that help you recall

3    anything?

4          A.    Yes.

5          Q.    Okay.  And that actually gave

6    you a recollection, or just looking at the

7    notes here?

8          A.    I remember the incident.

9          Q.    Okay.  Tell me about the

10   incident.  You're a party in it.

11         A.    I interviewed Police Officer

12   Gibson as a result of an arrest he made.  I

13   also interviewed a witness by the name of

14   Brenda Lee.  She witnessed the incident

15   happen.  And I prepared the Police Arrest

16   Report, otherwise known as the PARS.

17         Q.    Brenda Lee was a witness to the

18   incident?

19         A.    Correct.

20         Q.    Or she claimed to be a witness

21   to the incident, correct?

22         A.    Right.

23         Q.    But she was a witness to,

24   allegedly, my client doing something to

DET. SHERWOOD

9

1    somebody else's house, right?

2          A.    Her neighbor's house.  Yes.

3          Q.    What was the name of her

4    neighbor?

5          A.    If I can refer to the 75-48, it

6    was Brian Stewart.

7          Q.    Did you ever meet with Brian

8    Stewart?

9          A.    No, I did not.

10         Q.    Did you ever talk with Brian

11   Stewart on the phone, or in any other way?

12         A.    I attempted to call, and never

13   got through to him.

14         Q.    The number for Brian Stewart,

15   was that given to you by the witness, Brenda

16   Lee?

17         A.    No.  It was on the 75-48.  And

18   Brenda Lee stated that it was her cousin's

19   house.

20         Q.    Okay.  You met with Brenda Lee

21   in person?

22         A.    Correct, face-to-face interview.

23         Q.    She was brought in by the

24   officers?

DET. SHERWOOD                                    10

1          A.      Correct.

2          Q.      What did she tell you?

3          A.      She told me that she was out in

4    front of her house at 2216 Delhi Street;

5    that she seen a male bend down at her

6    neighbor's house.  She noticed there was a

7    shopping cart on the sidewalk.  She ran and

8    grabbed her phone.  And when she came back

9    out, the man was walking away with the

10   shopping cart.  She noticed that a window

11   grate was missing from, like, a basement

12   window.

13              She called 911, gave the

14   description and the location of the male.

15   She then stepped into her car and followed

16   the male while on the phone with 911.  She

17   observed the police stop the male at 11th

18   and Arizona Street.  And she told the male

19   -- or she told the police that the male they

20   stopped was the one that she seen taking the

21   window grate.

22          Q.      Now, the house that the window

23   grate was taken from was her cousin's house,

24   Brian Stewart, correct?

DET. SHERWOOD                           11

1          A.    Correct.

2          Q.    Did she give you a description

3    of what the window grate looked like?

4          A.    No.   The grate was not recovered.

5          Q.    Did you ever go out to Brian

6    Stewart's house to see the window?

7          A.    No.

8          Q.    The grate was not recovered.

9    Was the shopping cart ever recovered?

10         A.    I don't know.

11         Q.    She identified to the police my

12   client, Durant Tisdale, right?

13         A.    Correct.

14         Q.    And did you ask her what Mr.

15   Tisdale did with the grate and/or the

16   shopping cart?

17         A.    No.   She would have told me

18   while, you know, I was interviewing her as

19   to what happened, where the grate went or

20   where the shopping cart went.

21         Q.    So it was your understanding, at

22   the time that you were speaking to her and

23   taking her statement, that no evidence had

24   been recovered?

DET. SHERWOOD                                    12

1          A.      Correct.

2          Q.      And no tools or anything that

3   Mr. Tisdale could have used to remove this

4   grate were found on him; is that correct?

5          A.      To the best of my knowledge,

6   yes.  Nothing was recovered from him.

7          Q.      Now, did you speak to Officer

8   Whittaker and Officer Gibson on that night?

9          A.      I interviewed Police Officer

10  Gibson.

11         Q.      And what did Police Officer

12  Gibson tell you?

13         A.      He told me his tour of duty and

14  assignment on that night.  He had worked the

15  6p to 2a.  District 22, Bike 11.  He was on

16  patrol with his partner, Police Office

17  Whittaker.  They were in full uniform and

18  operating a marked police vehicle.  They

19  received a radio call of a theft in progress

20  at 2200 Delhi.  Flash information had been

21  given over police radio of a black male

22  wearing a black shirt, white hat, last seen

23  in the area of 10th and Dakota.  Police also

24  surveyed the area and observed the defendant

DET. SHERWOOD                    13

1    and witness at 1000 Arizona Street.

2              Upon their investigation, the

3    witness stated to police that she observed

4    the defendant take a white grate from the

5    basement window at 2200 Delhi Street.

6    Police placed the defendant in custody.  No

7    grate was recovered from the defendant.

8    With help from the witness, Police Officer

9    Gibson was able to contact Brian Stewart,

10   the owner of the property, by cell phone.

11   Defendant was transported to Detectives for

12   processing.

13        Q.   And that's how you got his phone

14   number, from Officer Gibson?

15        A.   It was on the 48 that was

16   provided; yes.

17        Q.   So Officer Gibson, as far as you

18   know, had the opportunity to speak to Brian

19   Stewart?

20        A.   Correct.

21        Q.   And did Officer Gibson report

22   that Brian Stewart gave no one permission to

23   take a grate from his window?

24        A.   The witness had given me that.

 1     I asked her had she spoke to Brian that

 2     night.  She stated yes.  And I asked -- I

 3     said, Did he give the male permission to

 4     take the grate?  She said, No.

 5             Q.    Okay.  So 2200 North Delhi

 6     Street -- that's how you pronounce Delhi,

 7     right?

 8             A.    Right.

 9             Q.    Aaron and I were wondering how

10     you actually pronounce that.

11                   You're familiar with that street?

12             A.    A little bit; yes.

13             Q.    Okay.  And the neighborhood

14     surrounding it?

15             A.    Kind of; yeah.

16             Q.    How far is 2200 North Delhi

17     Street from 1000 -- is it Arizona?

18             A.    Arizona.  I'm going to say about

19     four or five blocks.

20             Q.    Okay.  So it's walking distance?

21             A.    Yeah, walking distance.

22             Q.    And you were talking about

23     Brenda Lee staying on the phone with 911 --

24             A.    Mm-hmm.

DET. SHERWOOD                    15

1          Q.     -- and speaking to them

2     throughout the entire time?

3          A.     Yes.   That's what she stated.

4          Q.     Did you ever review the 911

5     tapes?

6          A.     No.

7          Q.     This incident is actually some

8     time back.   Did you ever order them?

9          A.     No.

10         Q.     Are they something, as far as

11    you know from your experience, that would

12    still be available today?

13         A.     No.

14         Q.     They get rid of them after a

15    certain amount of time?

16         A.     I believe -- yeah.   I believe

17    it's 60 days.   90 days?   I believe it's 90

18    days.

19         Q.     You were the assigned detective?

20         A.     Correct.

21         Q.     Now, as the assigned detective,

22    you would put together a discovery package --

23         A.     Correct.

24         Q.     -- for the DA's office?

DET. SHERWOOD                          16

1          A.    Yes.

2          Q.    And you're telling me that the

3    911 tapes are not part of that?

4          A.    Correct.

5          Q.    So in this case, or in any case,

6    generally speaking, there will be what's

7    called a 229 prepared?

8          A.    Correct.

9          Q.    And in this case was a 229

10   prepared?

11         A.    Yes.

12         Q.    Does it have a description of

13   what the defendant was wearing?

14         A.    No.   No clothing description was

15   provided.

16         Q.    And who fills that out?

17         A.    The arresting officer.

18         Q.    So that would be Officer Gibson,

19   in this case?

20         A.    Officer Gibson or his partner.

21         Q.    But that was not done in this

22   case?

23         A.    No.

24         Q.    So we don't have an actual

1    description of what they saw him wearing?

2         A.    No.

3         Q.    And other than the arrest photo

4    of the defendant, there's no other

5    photographs of him, correct?

6         A.    Correct.

7         Q.    Now, that photograph -- did you

8    see the defendant on the night of his arrest?

9         A.    No, I did not.

10         Q.    So you don't know if that's

11    from that night or not?

12         A.    Correct.

13         Q.    Is there anything on the

14    paperwork that tells you that that's

15    actually his arrest photograph?

16         A.    It says -- it has an arrest date

17    of July 6, 2013, 8:21 a.m., which would be

18    his photograph from this incident.

19         Q.    Okay.  Now, if somebody is

20    arrested, and they're arrested, you know,

21    three or four different times over a spanned

22    period of time --

23         A.    Yes.

24         Q.    -- do they get a new photograph?

DET. SHERWOOD                                    18

1          A.    Yes.

2          Q.    Every single time they get

3    arrested?

4          A.    Yes.

5          Q.    So that would be from the --

6          A.    From the current time; yes.

7          Q.    Obviously, over the course of

8    your career as an officer, going from an

9    officer up to the grade of detective, you

10   had a lot of different training?

11         A.    Sure.

12         Q.    What, if any, training are you

13   given regarding probable cause?

14         A.    It goes on the witness'

15   statement.  And in this particular case, you

16   know, she had seen him take the grate.  She

17   went and got her phone, called 911, followed

18   him until the police arrived.

19         Q.    Now, while she's following him,

20   does he still have the grate?

21         A.    I don't know.  She didn't say

22   that.

23         Q.    She didn't say that.  So he was

24   arrested in this case.  He was already

DET. SHERWOOD                          19

1    arrested by the time he met with you, right?

2          A.    Yes.   He had been brought in to

3    our division.   Yes.

4          Q.    Did you take a statement from

5    him?

6          A.    No, I did not.

7          Q.    In his biographical information,

8    is there anything about him having a job?

9          A.    No.

10         Q.    Do you know if he had a job or

11   not, from interviewing anyone?

12         A.    No.

13         Q.    So you're saying that under

14   Philadelphia protocol training, a site

15   arrest, despite no other evidence being

16   collected, can be based just on a witness'

17   information?

18         A.    True.

19         Q.    What would change that, if

20   anything, under the protocol?

21         A.    What would change?

22         Q.    Is there any protocol where you

23   wouldn't just rely on the statement of a

24   witness?

DET. SHERWOOD                                    20

1          A.    If we observed it.

2          Q.    Okay.  Well, that would be

3    yourself?

4          A.    Right, that would be ourselves.

5    Right.  Witnesses, complainants.  That's

6    what the job stands on.

7          Q.    Well, is it normal for the

8    Philadelphia police to arrest someone just

9    on one person's word?

10              MR. SHOTLAND:  Objection to

11         form.

12              You can answer.

13              THE WITNESS:  Yes.

14   BY MR. McDERMOTT:

15         Q.    It's my understanding, and tell

16   me if I'm wrong, that for purposes of the

17   first listing of a case where a preliminary

18   hearing indicates a felony, or just a trial

19   listing in municipal court, the assigned is

20   to reach out to the witnesses to let them

21   know to be there.

22              Is that correct?

23         A.    I've never done it in the four

24   years I've been a detective.

DET. SHERWOOD                                    21

1        Q.    So you rely on the DA's office --

2        A.    Correct.

3        Q.    -- to take your information and

4   subpoena the people or make sure that they're

5   there?

6        A.    Correct.

7        Q.    So on the date of the arrest,

8   you never saw the defendant and never

9   attempted to contact the witness to come to

10  court?

11       A.    Correct.

12       Q.    And the only witness you ever

13  contacted was Brian Stewart, without success?

14       A.    Correct.

15       Q.    Why was no statement attempted

16  to be gotten from the defendant in this

17  matter?

18       A.    We were extremely busy that

19  night.

20       Q.    So that could be one reason why

21  you want to take a statement?

22       A.    Right.

23       Q.    Is there another type of reason?

24       A.    If I were to go down and ask the

DET. SHERWOOD                    22

1    individual, in this case it would be Tyrone

2    or --

3            Q.    Durant --

4            A.    Durant Tisdale.

5            Q.    Right.

6            A.    If they would request a lawyer,

7    or if he was still intoxicated or high on

8    drugs, those would be the reasons I wouldn't

9    take his statement from him.

10           Q.    But you're saying your recall is

11   that it was too busy?

12           A.    Yes.

13           Q.    You had no reason to believe

14   that he was high on drugs --

15           A.    No.

16           Q.    -- alcohol, or anything of that

17   type?

18           A.    No.  I never interviewed him.

19           Q.    You never interviewed him.

20                 So you filled out the paperwork

21   that night, and that was basically the end

22   of it?

23           A.    I did the interviews and the

24   PARS report and the investigative report,

DET. SHERWOOD                                    23

1    which would be the 75-49.  I put the packet

2    together and I saved it into the PINN, and

3    it went to the DA's office.

4              Q.    Did you ever ask either Officer

5    Gibson or Office Whittaker what they did in

6    attempting to find any evidence?

7              MR. SHOTLAND:  When you say

8              "evidence," you mean physical

9              evidence, right?

10             MR. McDERMOTT:  Yes.  And, more

11             specifically, whether any evidence --

12             including the grate and the shopping

13             cart that was talked about.

14             THE WITNESS:  In their

15             interview, the grate would have been

16             mentioned, and then I would have put

17             it down.

18   BY MR. McDERMOTT:

19             Q.    Did either Officer Gibson or

20   Office Whittaker ever tell you that the

21   defendant stated anything to that?

22             A.    No.

23             Q.    So he never, as far as you know

24   in preparing the work, admitted that he had

DET. SHERWOOD                                    24

1    any involvement in reference to this grate

2    and the taking of the grate?

3         A.    Not to my knowledge, no.

4         Q.    And nobody went out the next day

5    in the light of day to search for the grate,

6    or anything like that?

7         A.    No.

8         Q.    Did anybody take photographs of

9    my client's hands to see if he had any paint

10   or anything on his hands that may have come

11   from pulling off a metal grate?

12        A.    No.

13        MR. McDERMOTT:  I have no other

14        questions.  Thank you.

15        MR. SHOTLAND:  I have one or two.

16                  -   -   -

17              EXAMINATION

18                  -   -   -

19   BY MR. SHOTLAND:

20        Q.    When you gathered all the

21   information that you gathered from the

22   officers, and you interviewed the witness,

23   you said you put that information in the

24   PINN and it went to the DA; is that right?

1          A.     Correct, the charging unit.

2          Q.     And who initiates the charge, or

3     who initiated the charge in this case

4     against Durant Tisdale?  Was it you or was

5     it the DA's office?

6          A.     The DA's office.

7                 MR. SHOTLAND:  That's all I have.

8                 MR. McDERMOTT:  Just a couple

9            follow-up questions.  I meant to do

10           this.

11                      -   -   -

12                  EXAMINATION

13                      -   -   -

14    BY MR. McDERMOTT:

15         Q.     Can you tell us everything you

16    have in front of you, just so we have it on

17    the record?  We have all the exhibits.  We

18    don't need to have them all marked.

19         A.     Sure.  I have the interview of

20    Police Officer Gibson, the 229, the

21    Biographical Information Report, the

22    interview of Brenda Lee, the 75-48, the

23    PARS report -- Police Arrest Report --

24    and a picture or photograph of Durant

1    Tisdale, a copy of the 75-48.

2              THE WITNESS:  And I don't know

3         if you meant to give that to me or

4         not (indicating).

5              MR. SHOTLAND:  I mean, it's not

6         something you relied upon, right?

7              THE WITNESS:  No.

8              MR. SHOTLAND:  It's just a

9         concise officer history.

10             MR. McDERMOTT:  Can I see it for

11        a minute?

12             MR. SHOTLAND:  Sure.

13             MR. McDERMOTT:  This is for

14        Officer Gibson.

15             MR. SHOTLAND:  It's not his.

16             MR. McDERMOTT:  So we'll put

17        that aside.  I can hold onto that.

18             MR. SHOTLAND:  Sure.

19   BY MR. McDERMOTT:

20        Q.   Now, in reference to counsel

21   asking you some questions about charging --

22        A.   Yes.

23        Q.   -- the Philadelphia District

24   Attorney's Office has its own charging unit?

DET. SHERWOOD                                27

1         A.    Correct.

2         Q.    And as of the date of this

3    accident, and sometime before, they had

4    taken over the charging of the crimes in

5    reference to any arrest?

6         A.    Sure.

7         Q.    So your job, the police officer's

8    job, your job, had changed from suggesting

9    what crimes should be charged, to simply

10   giving over the facts of what happened, and

11   then they determine what charges will go

12   with that?

13        A.    Correct.

14        Q.    Okay.  So there was a time, if

15   I recall, that the police actually did

16   the charging themselves without -- a long

17   time ago, maybe, before --

18        A.    Probably before my career, and

19   I'm going on 21 years.

20        Q.    But as of the time that the

21   charges are going over, the defendant is

22   already under arrest?

23        A.    Correct.

24        Q.    What, if any, discretion do you

DET. SHERWOOD                    28

1    have in saying these are the facts, he

2    shouldn't be charged, let him go?

3            A.    Once it goes to the DA's office,

4    it's in their hands.

5            Q.    No.   But I'm talking more when

6    you're doing your investigation and you put

7    all this in front of you.

8            A.    Right.

9            Q.    What discretion do you have, as

10   a Philadelphia detective in your assignment,

11   to say, you know what, we're not even

12   sending it over to the DA's office, set him

13   loose?

14           A.    I can use discretion.   Yes.

15           Q.    And in this case, you did use

16   your discretion and say, you know what, send

17   it over to them?

18           A.    There is enough here.   Yes.

19           Q.    So there's a pivotal point in

20   your job, that you actually make the

21   determination of whether there's enough to

22   seek charges against him?

23           MR. SHOTLAND:   Objection.

24           But you can answer.

DET. SHERWOOD                        29

1                 THE WITNESS:  Yes.

2      BY MR. McDERMOTT:

3             Q.    And what is that?  Where did you

4      get that authority from?

5             A.    I call the District Attorney's

6      office regarding the charging unit, and I

7      can run what I have in front of me by them,

8      and ask for their opinion to see if there's

9      enough.  In this case, I didn't.  There's

10     enough off the eyewitness, as well as the

11     police officer.

12            Q.    But just so I have this right,

13     if you feel there's not enough evidence, you

14     have the right to just say let him go?

15            A.    I have to get clearance from my

16     supervision.  I'd have to run it by the

17     sergeant, lieutenant; and, ultimately, they

18     would have me call the District Attorney's

19     charging unit.

20            Q.    Okay.  So when the decision is

21     going to be made that you don't think

22     there's going to be enough --

23            A.    Mm-hmm.

24            Q.    -- you're supposed to run it

DET. SHERWOOD

30

1    through --

2         A.    Yes, consult with my supervisor.

3         Q.    Consult with your supervisor,

4    who, in the end, based on your experience,

5    is going to say, you know what, call the

6    DA's office --

7         A.    Correct.

8         Q.    -- and talk to them?

9         A.    Correct.

10        Q.    But would you agree with me that

11   had you called the DA's office and told them

12   you don't think there's enough, they're not

13   going to disagree with you?

14             MR. SHOTLAND:  Objection.

15             You're really asking him to

16             speculate.

17             MR. McDERMOTT:  Well, let's do

18             it a different way.  I'll withdraw

19             that question.

20   BY MR. McDERMOTT:

21        Q.    In your experience, if you don't

22   think there's enough, but doing what you

23   believe to be correct in calling them, when

24   you tell them you don't think there's

1   enough, generally, do they say, that's fine

2   with us, kick him loose?

3          A.    Yes.

4          Q.    So I take it there's times you

5   call the charging unit.

6          A.    Not often.

7          Q.    Okay.  But when you do call the

8   charging unit --

9          A.    Right.

10         Q.    -- you're going to know some of

11  the ADA's assigned to the charging unit, or

12  you're not going to know them, or somewhere

13  in between?

14         A.    Yes.

15         Q.    But hearing from a detective

16  that you have these facts, on the times that

17  you've called before, they've always

18  followed your lead?

19         A.    Correct.

20         Q.    Okay.  So you never called and

21  said, these are the facts, I don't want to

22  arrest this guy; and they would have said,

23  you know, we disagree?

24         A.    I never called on this case, no.

DET. SHERWOOD                                    32

1          Q.    No, on any case, I'm talking

2    about.   In your past experience, every time

3    you have called, they've always agreed with

4    you and said don't arrest him?

5               MR. SHOTLAND:   Objection.  I

6          don't think that's what he said.

7    BY MR. McDERMOTT:

8          Q.    Okay.   I'm confused then.   What

9    I'm asking you is, not on this case, but in

10   general --

11         A.    Right.

12         Q.    -- there's been times in your

13   career when you called the charging unit --

14         A.    Correct.

15         Q.    -- and told the charging unit,

16   or whichever ADA you were speaking to, that,

17   I have this case --

18         A.    Mm-hmm.

19         Q.    -- I've spoken to the officers

20   and I've spoken to the witnesses, I don't

21   think there's enough to charge this man or

22   this woman.

23              Right?

24         A.    Correct.

DET. SHERWOOD                                    33

1          Q.    And on those occasions that

2     you've done that, I'm asking:  Has the ADA

3     in the office always agreed with your --

4          A.    No.

5          Q.    Okay.  So there have been times

6     previous to this when you said, I don't

7     think you should charge this guy.  And they

8     said, you know what, send it over anyway?

9          A.    Correct.

10         Q.    But in this case, you never

11    bothered to call because, in your mind,

12    there was enough probable cause to arrest?

13         A.    Correct.

14         Q.    Based on your training from the

15    police department that a person saying they

16    saw a crime occur is enough to arrest them?

17         A.    That's correct.

18         Q.    Because that's all you had in

19    this case.  You would agree with that?

20         A.    I would agree with that; yes.

21         Q.    I mean, you have officers that

22    go out and do their job.  In this case they

23    reported to you.  But in the end, the

24    evidence simply shows this lady, Mrs. Lee,

1    says that he stole a grate?

2              MR. SHOTLAND:  Objection.

3    BY MR. McDERMOTT:

4         A.   That's enough to arrest?

5              MR. SHOTLAND:  You can answer.

6              THE WITNESS:  Yes.

7    BY MR. McDERMOTT:

8         Q.   And that's what you relied on?

9         A.   Correct.

10        Q.   So it really comes down to you

11   relying, in reference to probable cause,

12   simply on what this lady told you when she

13   was sitting in front of you?

14             MR. SHOTLAND:  Objection.

15             You can answer.

16             MR. McDERMOTT:  Your objection

17        is?

18             MR. SHOTLAND:  I don't think

19        it's accurate as to what he said.

20        He didn't just rely on the witness'

21        testimony.  He relied on the

22        officers and what they saw.

23   BY MR. McDERMOTT:

24        Q.   Is that true what counsel just

DET. SHERWOOD                                    35

1    said?

2           A.    Correct.

3           Q.    What about what the

4    officers said -- and in this case, Officer

5    Gibson, because that's the only officer you

6    talked to -- did you rely on for probable

7    cause?

8           A.    On what he told me the witness

9    had told him.

10          Q.    Okay.  So the same -- and,

11   basically --

12          A.    Same theory.

13          Q.    Same thing that she said to him

14   is what she said to you?

15          A.    Correct.

16          Q.    So that's all you relied on?

17          A.    That's correct.

18          MR. McDERMOTT:  I have no other

19      questions.

20          MR. SHOTLAND:  I mean, just to

21      follow up on that.

22                    -   -   -

23             EXAMINATION

24                    -   -   -

36

1     BY MR. SHOTLAND:

2           Q.    Officer Gibson was able to tell

3     you that Durant Tisdale was at the scene of

4     the arrest, correct?

5           A.    That's correct, and the witness

6     had pointed him out.

7                 MR. SHOTLAND:  That's all.

8                       -   -   -

9                 EXAMINATION

10                      -   -   -

11    BY MR. McDERMOTT:

12          Q.    And the scene, when you're

13    referencing the scene --

14          A.    Scene of the crime.

15          Q.    Durant Tisdale was never seen at

16    the 2200 block of North Delhi Street --

17          A.    Right.

18          Q.    -- by Officer Gibson, at any

19    time, right?

20          A.    To my knowledge, right.

21                MR. McDERMOTT:  Thanks a lot.

22                (Witness excused.)

23                (Whereupon, the deposition

24    concluded at 2:42 p.m.)

37

```
1                    C E R T I F I C A T E
2          I HEREBY CERTIFY that the witness was
3     duly sworn by me and that the deposition is
4     a true record of the testimony given by the
5     witness.
6
7
8
9
10        ------------------------------------
          Susan B. Berkowitz, a
11        Registered Professional Reporter
          and Notary Public
12        Dated:  January 25, 2016
13
14
15
16
17               (The foregoing certification
18     of this transcript does not apply to any
19     reproduction of the same by any means,
20     unless under the direct control and/or
21     supervision of the certifying
22     reporter.)
23
24
```

1

```
 1            IN THE COURT OF COMMON PLEAS
             PHILADELPHIA COUNTY, PENNSYLVANIA
 2                      -   -   -

 3   DURANT TYRONE TISDALE   :   CIVIL ACTION
                  Plaintiff  :
 4                           :
             v.              :
 5                           :
     CITY OF PHILADELPHIA-    :
 6   LAW DEPARTMENT and       :
     PHILADELPHIA POLICE      :
 7   OFFICER TIMOTHY GIBSON,  :
     BADGE #4742              :
 8   and                     :
     PHILADELPHIA POLICE      :
 9   OFFICER DAVID SHERWOOD,  :
     BADGE #714               :
10               Defendants  :   NO. 15-cv-5209

11                      -   -   -

12              January 14, 2016

13                      -   -   -

14        Oral deposition of OFFICER ROBERT

15   WHITTAKER, taken pursuant to notice, was

16   held at the City of Philadelphia-Law

17   Department, 1515 Arch Street, 14th Floor,

18   Philadelphia, Pennsylvania 19102, commencing

19   at 3:20 p.m., on the above date, before

20   Susan B. Berkowitz, a Registered

21   Professional Reporter and Notary Public in

22   the Commonwealth of Pennsylvania.

23                      -   -   -

24
```

2

1      APPEARANCES:

2

3      MICHAEL I. McDERMOTT, ATTORNEY AT LAW
       BY:   MICHAEL I. McDERMOTT, ESQUIRE
4      1026 Winter Street
       Philadelphia, Pennsylvania 19107
5      Telephone:  (215) 925-9732
       E-mail:  mmcder1188@aol.com
6      Counsel for Plaintiff

7

8      CITY OF PHILADELPHIA - LAW DEPARTMENT
       BY:   AARON SHOTLAND, ESQUIRE
9      1515 Arch Street, Suite 14-A
       Philadelphia, Pennsylvania 19102
10     Telephone:  (215) 683-5434
       E-mail:  aaron.shotland@phila.gov
11     Counsel for Defendants

12

13     ALSO PRESENT:   OFFICER GIBSON

14

15

16

17

18

19

20

21

22

23

24

137

3

1                        I N D E X

2     Testimony of:   Officer Robert Whittaker

3     By Mr. McDermott . . . . . . . . . 5

4

5

6

7                        -   -   -

8                   E X H I B I T S

9                        -   -   -

10

11    NO.              DESCRIPTION              PAGE

12

13    (There were no exhibits marked at this time.)

14

15

16

17

18

19

20

21

22

23

24

4

```
 1            DEPOSITION SUPPORT INDEX

 2

 3   Direction to Witness Not to Answer

 4   Page Line        Page Line          Page Line

 5   None

 6

 7

 8

 9   Request for Production of Documents

10   Page Line        Page Line          Page Line

11   None

12

13

14

15   Stipulations

16   Page Line        Page Line          Page Line

17      5    1 - 7

18

19

20

21   Question Marked

22   Page Line        Page Line          Page Line

23   None

24
```

139

OFFICER WHITTAKER                    5

1              (It is hereby stipulated and
2          agreed by and between counsel that
3          signing, sealing, filing and
4          certification are waived; and that
5          all objections, except as to the
6          form of questions, be reserved until
7          the time of trial.)
8                    -   -   -
9              OFFICER ROBERT WHITTAKER, after
10         having been duly sworn, was examined
11         and testified as follows:
12                   -   -   -
13                 EXAMINATION
14                   -   -   -
15    BY MR. McDERMOTT:
16         Q.    Officer Whittaker, did you hear
17    the various instructions that were given to
18    Officer Gibson?
19         A.    I did.
20         Q.    Do you need any clarification on
21    them?
22         A.    I do not.
23         Q.    Okay.  Have you ever been
24    deposed before?

1          A.     No, I haven't.

2          Q.     But you've given testimony in

3     court under oath?

4          A.     Correct.

5          Q.     You were on duty with Officer

6     Gibson on July 5th of 2013, correct?

7          A.     That's correct.

8          Q.     You came in contact with Brenda

9     Lee?

10         A.     That's correct.

11         Q.     What do you recall Brenda Lee

12    telling you about what happened?

13         A.     How I recall it was, I believe a

14    police radio gave out the flash, black male,

15    black shirt, white hat.  I believe Brenda

16    Lee was still on the phone with police

17    radio, giving out the location she last saw

18    the male, and I believe that was 10th and

19    Dakota.  We were on our way there when we

20    observed Mr. Durant (sic) with a black shirt

21    and white hat on.  We stopped him.  Actually,

22    we exited the vehicle.  And when we

23    exited the vehicle, and simultaneously

24    stopped him, Brenda Lee was there,

OFFICER WHITTAKER                    7

1   stating, That's the man, that's the one,

2   that's the one.  And we stopped Mr. Tisdale.

3         Q.    Let me ask you a question.  When

4   you're on patrol --

5         A.    Correct.

6         Q.    -- you're hearing radio calls

7   over 911 pretty much the whole night,

8   correct?

9         A.    Correct.

10         Q.    If Brenda Lee is telling 911

11   something, do you hear Brenda Lee's voice?

12         A.    No.

13         Q.    Okay.  So Brenda Lee could tell

14   911 dispatch whatever she wants to tell

15   them, and then dispatch talks to you?

16         A.    Correct.

17         Q.    So you're saying that you recall

18   that she was on the phone with 911 in the

19   area of 10th and Dakota?

20         A.    I believe.  And if I can look at

21   Mrs. Lee's statement to Detectives, I think

22   she says it here that she was on the phone

23   -- she stayed on the phone with 911.  So,

24   yes, she was on the phone with 911.

1      Q.     Now, you also stated that you
2   knew her to be on the phone with 911 at
3   10th and Dakota.
4      A.     To my best recollection, she was
5   on the phone with 911, giving radio flash
6   information as to where she last saw the
7   male and where the male was.
8      Q.     So that's how 10th and Dakota
9   came up, because Brenda Lee gave information
10   that that's where he was?
11         MR. SHOTLAND:   Objection.
12         But you can answer, if you can.
13         THE WITNESS:   Yes.
14   BY MR. McDERMOTT:
15      Q.     Okay.   And if you're at 10th and
16   Dakota, right, how would you get to a point
17   where you're walking west on Arizona?
18      A.     Well, 10th and Dakota, 11th
19   and Arizona -- it's about half a block south
20   and a block west of where we stopped Mr.
21   Tisdale.
22      Q.     Okay.
23      A.     And that would be in the
24   direction -- it would be walking away.

1    Like, Delhi would be here (indicating), 10th

2    and Dakota would be here (indicating), and

3    11th and Arizona would be here (indicating).

4    So, like, yeah, it's like an L.

5            Q.    So did you ever ask Brenda Lee,

6    What did he do with the grate?

7            A.    To my recollection, no.  I can't

8    remember specifics of what was asked and

9    what was said on the scene, as far as that.

10   We did survey for the grate.

11           Q.    Okay.  What area did you survey?

12           A.    I believe that's the 1000 block

13   of Arizona to about 10th and Dakota, which

14   is only about half a block away.

15           Q.    We're talking about a grate,

16   and looking for the grate?

17           A.    That's correct.

18           Q.    In her statement to the

19   detective, she said that he had a shopping

20   cart, and that the grate was in the shopping

21   cart.

22                 Did you know about the shopping

23   cart when you were in contact with Brenda

24   Lee and Durant Tisdale?

144

OFFICER WHITTAKER                    10

1          A.    I can't recall.  If she said it
2     was a grate or a shopping cart -- it was in
3     the shopping cart -- I don't recall.
4          Q.    So you were surveying the area
5     for a grate, not a shopping cart?
6          A.    I cannot recall.  This was three
7     years ago.  Whether she said it was a
8     shopping cart -- if that's in the paperwork,
9     that it said it was a shopping cart, I would
10    assume that I would be looking for a
11    shopping cart.  But if it says "grate" in
12    the paperwork, I was looking for a grate.
13         Q.    The 48, can you read your
14    partner's handwriting?
15         A.    Yes.
16         Q.    Is there anything in there about
17    asking her any questions about the evidence;
18    the grate and/or shopping cart?
19         A.    It doesn't say whether she was
20    asked the question.  It wouldn't usually be
21    in the 48, if there was a question.
22         Q.    Where would it be?
23         A.    It would probably be in the
24    statement to the detective.  Then, again,

1   that's more of an interview a detective

2   would probably give, as far as putting it on

3   paper or stuff.

4        Q.   I mean, did you give a statement

5   to the detective?

6        A.   The detective felt my partner's

7   statement would be enough.

8        Q.   The biographical information

9   sheet, do you recognize that?

10       A.   I do.

11       Q.   Is that your handwriting?

12       A.   I can't -- I'm not sure.  I

13  don't think so.

14       Q.   You're looking at handwriting.

15  But you can't judge whether it's yours or

16  not?  But you don't think it is?

17       A.   It's chicken scratch.  It could

18  be mine.  If there was a back side to this,

19  that would solve the problem.

20       Q.   Is there a back side to the

21  biographical sheet?

22       A.   There usually is, but I don't

23  see one.

24       Q.   Would you sign off on the back

1    side?

2            A.    You would sign off on the back

3    side.

4            Q.    Okay.  But you agree that

5    there's no information about the clothes he

6    was wearing?

7            A.    Yes.

8            Q.    Do you recall what color his

9    pants were?

10           A.    If it was -- no, I don't recall.

11   But like my partner said -- there was a 48A.

12   It would all be on that.

13           Q.    Is it ever recorded anywhere,

14   for police paperwork purposes, what else the

15   person has, such as a wallet, money, or

16   anything like that?

17           A.    That would be on the property

18   receipt or the slip that he gets once he

19   goes into a cell.

20           Q.    Okay.  So that's stuff that he

21   hands over for purposes of --

22           A.    Right.  They're not going to let

23   anybody go into a cell with their wallet or

24   shoelaces.

OFFICER WHITTAKER                    13

1           Q.      That's not something you do,

2    though?

3           A.      That would be something the

4    Turnkey Detective Division does.

5           Q.      How long were you a police

6    officer as of that date?

7           A.      That date?  Three years.  Give

8    or take three years.

9           Q.      What was your training in

10   reference to probable cause?

11          A.      Philadelphia Police Academy.

12          Q.      And give me your definition of

13   what probable cause is?

14          A.      The reasonable suspicion that a

15   crime had been committed; that a reasonable

16   person had seen a crime being committed.

17          Q.      And you believed on that night

18   that Mr. Tisdale had committed a crime?

19          A.      I believed, yes, that night.

20   The witness seemed very credible and was

21   pretty persistent, as far as following the

22   male, but, yes, that a crime had been

23   committed.

24          Q.      And you knew that when you were

14

1   out on the street that she had been

2   persistent in following him?

3           A.    Due to her giving flash

4   information over 911 and actually being on

5   the scene as we stopped the male; and

6   simultaneously, she seemed pretty adamant

7   that this male had committed a crime.  And

8   I felt good enough to take that down to

9   Detectives.

10              MR. McDERMOTT:  I have no other

11         questions.

12              MR. SHOTLAND:  I don't have any

13         questions.

14              (Witness excused.)

15              (Whereupon, the deposition

16         concluded at 3:30 p.m.)

17

18

19

20

21

22

23

24

149

15

```
1                    CERTIFICATE

2          I HEREBY CERTIFY that the witness was

3     duly sworn by me and that the deposition is

4     a true record of the testimony given by the

5     witness.

6

7

8

9          ----------------------------------
10         Susan B. Berkowitz, a
           Registered Professional Reporter
11         and Notary Public
           Dated:  January 25, 2016
12

13

14

15

16

17              (The foregoing certification

18     of this transcript does not apply to any

19     reproduction of the same by any means,

20     unless under the direct control and/or

21     supervision of the certifying

22     reporter.)

23

24
```